IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,269

STATE OF KANSAS,
*Appellee*,

v.

KYLE CARTER,
*Appellant*.


SYLLABUS BY THE COURT

1.

The defendant's multiple allegations of prosecutorial misconduct are without merit, save one. The prosecutor committed misconduct by arguing a fact not in evidence, *i.e.*, that a codefendant had blamed the defendant for fatally stabbing the victim. This statement by the prosecutor qualified as gross and flagrant conduct but did not evidence ill will, and the evidence against the defendant was strong. The error is not reversible.


2.

A judge's preliminary statement to jurors that they have an "obligation" to convict when "convinced beyond a reasonable doubt that what the State alleges occurred" is error but, on the record in this case, not reversible.


3.

On the record in this murder-by-stabbing case, the judge erred in omitting a lesser included offense instruction on reckless second-degree murder. However, the unsought instruction would have made no difference in the guilty verdict for premeditated first-degree murder; the jury had the option to convict of intentional second-degree murder and did not take it.

1

4.

It is unnecessary to add "mere association or presence is insufficient to establish guilt as an aider or abettor" to a jury instruction on aiding and abetting if it is factually inappropriate. On the record in this case, including defendant's own testimony confirming that his participation in the crime clearly exceeded mere association or presence, the additional language was factually inappropriate.

5.

On the record in this case, three unrelated errors do not require reversal under the doctrine of cumulative error.

Appeal from Sedgwick District Court; WARREN M. WILBERT, judge. Opinion filed September 30, 2016. Affirmed.

*Samuel Schirer*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Kyle Carter appeals his conviction for premeditated first-degree murder. Carter raises five issues in his appeal, including multiple claims of prosecutorial misconduct, multiple claims of instructional error, and a claim that cumulative error compels reversal.

As detailed below, we ultimately reject Carter's arguments and affirm his conviction and sentence.

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of September 7, 2013, through the early morning hours of September 8, friends Kyle Carter and Trenton Custer went to a couple of bars before ending up at Michelle Wilmore's Wichita home.

About 3:45 a.m. Richard Heptig, who lived near Wilmore, found a man named Carl Cooper on his front porch. Cooper and the porch were covered in blood. Cooper told Heptig that he had been stabbed by two men who fled in a white truck. Heptig's wife called 911, and the dispatcher issued a radio call about the stabbing. The call provided Heptig's address and described the fleeing suspects' vehicle as a white truck.

Cooper later died of his injuries.

Moments after the call went out, an officer saw a white truck only five blocks from the scene. Because it matched the vehicle description, he stopped the truck. Other officers arrived to provide backup. The driver and lone occupant was identified as Custer. When asked if there were any weapons in the car, Custer said there was a knife on the floor. An officer picked up the knife, unsheathed it, and saw that the blade was bloody. Custer was arrested.

At 4:02 a.m. defendant Kyle Carter sent Custer the following text message:  "Hey bro I'm sorry if I got out of line on that. I just got alot of anger built up and that was the time to let some out. But I am sorry. . ."

3

An investigator would later testify that he followed a trail of blood from Heptig's porch to the College Hill Park pool across the street. Another investigator would measure the distance from Wilmore's home to the start of the blood trail at 847 feet.

Investigating officers went to Custer's house later the morning of his arrest. They were looking for Custer's wife, Sara, but found Carter, who had been living in Custer's house. Carter's name had not yet surfaced. Officers informed Carter that they were investigating an incident that involved Custer, but they did not mention it was a stabbing. Officers would later testify that Carter told them he and Custer had gone to a couple of bars the night before but had separated about 3 a.m. Carter said Custer may have gone to Wilmore's house. He failed to tell them he had been to Wilmore's house. The officers communicated that they would be going to Wilmore's house after talking to Carter.

Wilmore would later testify that Carter called her, told her officers were coming to her house, and asked her to tell them he had not been there. Carter also sent Wilmore a text message telling her that the officers had said Custer stabbed someone, even though officers had not yet provided that level of detail to Carter.

Officers arrived at Wilmore's house for the first time before noon. Wilmore had surveillance cameras that enabled her to see her porch and front yard on a television screen in her bedroom. Early that morning, she said, she had seen a man breaking into one of her cars and had seen Custer's truck drive by as the man was running away. She also said she never saw Custer without Carter, so officers became suspicious that Carter had been involved as well.

Tracey Mans, the mother of Carter's son, and Sara would both testify later that they spoke with Carter the morning that officers were investigating. Carter told them that a man had broken into Wilmore's car early that morning and that Carter "beat him up."

4

Carter also told Sara that the police had arrested Custer and that they thought he had stabbed someone. Sara decided to call the police station to figure out what was going on.

While officers were en route from Wilmore's house to speak to Carter again, they received word that Sara had called the police station and reported that Carter had told her he and Custer had seen someone breaking into a friend's car and had beaten him up and "punished" him.

Officers then returned to Wilmore's house. They found Carter on her front porch and arrested him.

The officers also spoke with Wilmore again. She admitted that Carter was at her house when she observed what she thought was a burglary of her car. She said that Carter and Custer were together at her house and that they pursued the man breaking into her car—Carter on foot and Custer in his truck. Wilmore said Carter and Custer returned a short time later. Carter told her that he had caught the burglar and that the burglar would not bother her again.

While interviewing Carter, officers noticed that he had blood on the cuticle of his smallest left finger. A crime scene investigator swabbed the cuticle.

An autopsy conducted on Cooper revealed three stab wounds: one on the middle of the left side of his back and two on the backside of his left thigh. The wounds indicated great compressive force. One was more than 6 inches deep and another was 5-1/2 inches deep, while the murder weapon, the knife found in Custer's truck, had a blade shorter than 4 inches. Cooper had no defensive wounds on his body.

The State charged Carter and Custer with the premeditated first-degree murder of Cooper. At their joint preliminary hearing, neither testified, and no other witness testified that Custer had implicated Carter in Cooper's death. The district judge bound both men over on the murder charge.

Carter's trial began the following April. Before the start of voir dire, the district judge provided potential jurors with information about serving as a juror, including qualifications, scheduling, and the "basic tenets of a criminal case." He explained the State's burden of proof, the presumption of innocence, and then told potential jurors: "It's only if and when you are convinced beyond a reasonable doubt that what the State alleges occurred, that they have proven their case, the presumption then leaves the defendant and then your obligation becomes to vote guilty, if you are convinced beyond a reasonable doubt."

Prosecutors Justen Phelps and Heather Botter presented the State's case. Among their witnesses was the investigator who processed Custer's truck. The investigator photographed the knife found on the floor and determined that its blade was 3-3/4 inches long. He was unable to locate any fingerprints on the knife. Another of the State's witnesses was the forensic scientist who performed DNA analysis on the blood from the knife and from Carter's cuticle. Both samples matched Cooper's DNA.

Carter testified in his own defense. He said that he and Custer went to Wilmore's house early on the morning of September 8. When Wilmore thought she saw someone on her surveillance monitor, she asked Carter to check. Carter went to the front door to look out. He saw a man in her car and yelled, "Get the fuck out of the car," and the man, later identified as Cooper, ran away. Carter thought he saw something in Cooper's hands, and so he ran after him.

The pursuit was headed toward College Hill Park pool when Custer drove past Carter in his truck. Carter said he saw Custer pull up to Cooper and jump out. Carter saw a brief fight between Custer and Cooper and then saw Cooper fall to the ground. Carter did not see a knife. He kept running toward the two men. When he reached them, Custer was backing away from Cooper, and Cooper was on the ground. Carter took a right-handed swing at Cooper but missed. Carter's next swing with his left hand connected to Cooper's hand. Carter said Cooper ultimately walked away. Carter said he did not see any blood on Cooper or in the grass; he said he had no idea that Cooper had been stabbed.

Because Custer had already left in his truck, Carter walked back to Wilmore's house. Custer was there when he arrived. Carter said Custer appeared nervous and was pacing. Custer left soon after, but Carter remained at Wilmore's. Carter eventually returned to Custer's house, but Custer was not there. Carter called Sara, looking for Custer. He told her that a man had broken into a friend's car and said he had beaten the man up.

Carter testified about his arrest after he had returned to Wilmore's house. When Carter spoke with officers after his arrest, *i.e.*, the second time during the investigation, he conceded that he had been at Wilmore's during the night but he claimed to know nothing about the stabbing and again failed to mention that he had struck Cooper. When officers confronted him with inconsistencies in his story, he eventually gave more information but never admitted to punching Cooper. Carter admitted on the stand that he had not been forthcoming with officers. He said he had not mentioned the car burglary or the fight between Custer, Cooper, and himself because he "just didn't want to be involved in it." He acknowledged texting Wilmore that Custer had stabbed somebody despite the fact that officers had not told him the type of weapon Custer had used. He testified that he merely assumed it was a stabbing because Custer always carried a knife and never carried

7

a gun. Carter also admitted that he had asked Wilmore to tell officers he had not been at her house earlier in the morning.

On cross-examination of Carter, Phelps highlighted multiple inconsistencies in the various versions of events Carter had given to officers. Carter agreed that there were inconsistencies when he was shown transcripts of earlier interviews. He also admitted that he had been trying to protect himself.

During the jury instruction conference between counsel and the district judge, defense counsel objected to the language of the aiding and abetting instruction, claiming the evidence did not support it. But counsel did not request any different or supplemental language. The district judge considered the objection and overruled it. The district judge said he would instruct on premediated first-degree murder and the lesser included offense of intentional second-degree murder. Defense counsel neither requested any additional lesser included offense instructions nor objected to the exclusion of any.

When the district judge read the instructions to the jury, the reasonable doubt instruction included the following language: "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find Kyle Carter guilty." The district judge instructed the jury to consider first-degree murder and its lesser included offense of intentional second-degree murder as follows: "If you do not agree the defendant is guilty of murder in the first degree, you should then consider the lesser included offense of murder in the second degree." The district judge also instructed the jury on the definition of premeditation: "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Phelps argued for the State in closing. He said:

"Ladies and gentlemen, you know what Kyle Carter did at this point. You know that this is the weapon that was used to murder Carl Cooper. You have seen the pictures. You have heard from Dr. [Jamie] Oeberst. You know that this knife was used to stab Carl Cooper not once, not twice, but three times; that it was used to stab Carl Cooper in the back; that two of those stab wounds were so forceful that they compressed his body twice the length of the blade, on the one on the left flank. You know that one of them severed his 12th rib.

"You know that Carl Cooper was taken by surprise. He had no defensive injuries from trying to shelter himself from the three knife attacks. You know that he had no blunt force trauma on him from being beaten.

"What you know from the photographs of Carl Cooper is that this defendant and Trenton Custer stabbed him with three swift, strong strokes of that knife, and that they committed intentional and premeditated murder."

Phelps then attempted to explain the concept of premeditation to the jury:

"Premeditation is a state of mind. A lot of people think premeditation is Trenton Custer and Kyle Carter sit down and then go over some type of plan, have some agreement in place before they commit this killing. That is not—that would be premeditation, but that is not what is required to prove premeditation. The requirement is the state of mind. This defendant has to think about the act of killing Carl Cooper before he does it. He has to consider that this is what he is going to do. It just cannot be instantaneous.

"He had more than two blocks to think about it. We will get into that, but that is what premeditation means. That is the definition of premeditation. That is what the State is required to prove; not that they sat down, worked it out, had some type of plan, but that

9

he considered killing Carl Cooper before he did it. That intent was in his mind. It wasn't something spontaneous. Okay. Let's walk through the evidence."

## Phelps continued:

"Again, we are not going to sit here as we talk about the evidence and pretend like we don't know what happened. We know what happened to Carl Cooper. We know that he was stabbed three times in the back. That was not some type of altercation or fight, that this was a complete surprise attack. As soon as they got him, they stabbed him three times. I'm talking about this evidence. I'm arguing from that perspective. That is what happened. That is what the evidence shows."

## Phelps also addressed Carter's lack of remorse:

"Does he react like someone who was surprised or that this killing of Carl Cooper was unexpected? Michelle Wilmore tells you that he was calm. She tells police he was calm. He acted like it was nothing. He is not the one tripping out, trying to bail, nervous, quiet. That lack of remorse shows you, after the fact, it shows you that before the killing, he knew what he was doing and he did exactly what he set out to do."

## Phelps also attempted to address Carter's multiple versions of events:

"[PROSECUTOR:] How can you believe anything that defendant says[?] It's a third version of the events. Every time he is confronted with a new piece of evidence, you get new information from him trying to explain it away. How can you believe anything he tells you?

"[DEFENSE COUNSEL]: Objection, that is improper argument.

"[DISTRICT JUDGE]: It's getting very close, but I will overrule the objection. You know the issue about commenting on a witness's credibility.

10

"[PROSECUTOR]:  I make that comment in light of the evidence; that he has given three different versions. I want to make that clear. At what point do we say enough? At what point do we say that this is just him trying to protect himself?"

Defense counsel argued during closing:

"This is about evidence. This isn't about, you know, they could have called the cops. This isn't about, you know, I'm going to err on the side of caution. I don't know if he did it or not, but this is about evidence. This is about you being the type of juror you would want in your own case.

"[PROSECUTOR]:  Completely inappropriate comment, object.

"[DISTRICT JUDGE]:  Overruled. . . .

"[PROSECUTOR]:  He now places the jurors in the position of the defendant.

"[DISTRICT JUDGE]:  What the attorneys say in closing arguments is not evidence."

During the rebuttal portion of his closing, Phelps discussed aiding and abetting:

"So I think at this point, ladies and gentlemen, you understand how this works. We try them separately. Kyle Carter says it was Trenton Custer. Trenton Custer says it was Kyle Carter and, guess what, that is exactly why the law of aiding and abetting exists.

"Instruction number 7 tells you a person is criminally responsible for a crime if the person either before or during the commission with the mental culpability required to commit the crime, intentionally aids another to commit the crime."

11

Phelps also said:

"You know, it's funny that the defense would ask you if you are the type of juror that you would want to be in your case. The fact of the matter is you are not sitting over there, and that is about as appropriate as me saying are you the kind of juror that you would want to be if you were one of Carl Cooper's family members. It's completely inappropriate.

"Are you the kind of juror [who] is . . . going to look at the evidence in this case and draw conclusions about what it shows you?"

PROSECUTORIAL MISCONDUCT

Carter's first claim of error on appeal takes issue with several passages in Phelps' closing argument. Carter asserts he is entitled to reversal because Phelps:

- Encouraged the jury to disregard the district judge's admonition not to prejudge the case by telling the jury repeatedly that it already knew certain facts, including some disputed facts, and that it already knew what Carter had done;
- Misstated the law of premeditation by suggesting that any non-instantaneous killing is premeditated, including saying that Carter "had more than two blocks to think about" killing Cooper and "that is what premeditation means. That is the definition of premeditation";
- Erroneously and illogically argued that Carter's lack of remorse circumstantially demonstrated the existence of premeditation;
- Referred to an extremely prejudicial fact not in evidence when he stated that Custer had blamed Carter for Cooper's murder;

12

- Made an improper adverse comment on Carter's decision to testify on his own behalf and violated a long-standing rule that a prosecutor may not suggest that a defendant is lying, focusing on Phelps' argument that the jury could not believe Carter because he had given three varying versions of events and Phelps' rhetorical "[a]t what point do we say enough?";

- Inappropriately argued that the jury should disregard a ruling from the district judge on a defense argument about jury members being the type they would want if they were defendants; and

- Improperly elicited sympathy for the victim's family by comparing defense counsel's remark to a prosecution request that jurors behave as they would want jurors to behave if they were members of Cooper's family.

We will take up each of these criticisms of Phelps' closing argument in turn.

*Standard of Review*

In *State v. Sherman*, 305 Kan. ___, ___ P.3d ___, 2016 WL 4719688 (2016), filed September 9, 2016, we announced a new framework for consideration of criminal defendants' challenges to their convictions and sentences based on the behavior of prosecutors. *Sherman* has drawn a distinction between prosecutorial conduct that is merely negligent or careless and prosecutorial conduct that is intentional or in some way malicious. 2016 WL 4719688, at *13, 17. Either can lead to closing argument error if it means that the prosecutor has strayed outside the wide latitude allowed the State's lawyer when discussing the evidence. Such an error, a violation of the defendant's right to due process, is subject to appellate court examination for harmlessness under the federal constitutional standard set forth in *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 2016 WL 4719688, at *13-14.

13

Because *Sherman* was not decided until after this case was argued and fully submitted for decision, the parties have not had an opportunity to address it. We will therefore apply our old prosecutorial misconduct framework to the claims advanced here, noting only that application of the new framework would not make a difference in the outcome.

Our old framework has been stated often:

"We review such claims even when a contemporaneous objection was not made at trial. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012), *cert. denied* 133 S. Ct. 529 (2012). Our analysis has two steps. First, the court determines whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. If the comments were improper and constituted misconduct, the appellate court must determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Roeder*, 300 Kan. 901, 932-33, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). In the second step, we consider three factors: (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *State v. Williams*, 299 Kan. 509, 540, 324 P.3d 1078 (2014)[, *overruled on other grounds in State v. Dunn*, 304 Kan. 807-11, 375 P.3d 332 (2016)]. None of these factors is individually controlling. Before the third factor can ever override the first two factors, we must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. *Williams*, 299 Kan. at 540-41. As a practical matter, however, if the constitutional harmless error test is met, the statutory test also will be met. See *State v. Lowrance*, 298 Kan. 274, 282, 312 P.3d 328 (2013) (when State meets constitutional harmlessness test it necessarily also meets lower statutory harmlessness test as well). Under the constitutional test, the party benefitting from the error must demonstrate beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, *i.e*., there is no reasonable possibility that the error contributed to the

14

verdict. [*Williams*,] 299 Kan. at 541." *State v. Fisher*, 304 Kan. 242, 251, 373 P.3d 781 (2016).

*Prejudgment of Case*

Carter first focuses on what he argues was Phelps' encouragement of noncompliance with the district judge's admonishment not to form a conclusion about the case until it was finally submitted for deliberation. The relevant passages read:

"Ladies and gentlemen, you know what Kyle Carter did at this point. You know that this is the weapon that was used to murder Carl Cooper. You have seen the pictures. You have heard from Dr. Oeberst. You know that this knife was used to stab Carl Cooper not once, not twice, but three times; that it was used to stab Carl Cooper in the back; that two of those stab wounds were so forceful that they compressed his body twice the length of the blade, on the one on the left flank. You know that one of them severed his 12th rib.

"You know that Carl Cooper was taken by surprise. He had no defensive injuries from trying to shelter himself from the three knife attacks. You know that he had no blunt force trauma on him from being beaten.

"What you know from the photographs of Carl Cooper is that this defendant and Trenton Custer stabbed him with three swift, strong strokes of that knife, and that they committed intentional and premeditated murder.

. . . .

"Again, we are not going to sit here as we talk about the evidence and pretend like we don't know what happened. We know what happened to Carl Cooper. We know that he was stabbed three times in the back. That was not some type of altercation or fight, that this was a complete surprise attack. As soon as they got him, they stabbed him three times. I'm talking about this evidence. I'm arguing from that perspective. That is what happened. That is what the evidence shows."

15

K.S.A. 22-3420(2), the version of the pertinent statute in effect at the time of Carter's April 2014 trial, required the district judge to admonish the jurors at every break "that it is their duty not to form or express an opinion thereon until the case is finally submitted to them." And we have recognized a juror's duty "to keep an open mind until the case is submitted . . . for deliberation." *State v. Hays*, 256 Kan. 48, 60, 883 P.2d 1093 (1994). We also have held that there was misconduct when a prosecutor's argument suggested to a jury that it did not have to keep an open mind. See *State v. Armstrong*, 299 Kan. 405, 418-19, 324 P.3d 1052 (2014) (prosecutor told jury "'as you sit right there, you have an opinion, you don't get to share it yet until you deliberate, but you have an opinion. Every one of you has an opinion right now.'").

According to Carter, Phelps' statements about jurors "knowing" what Carter did and what the photographs showed was improper because they told jurors they had already formed an opinion about the case in violation of K.S.A. 22-3420(2). We disagree. When read in context, Phelps' statements differ from those addressed in our *Armstrong* precedent. Phelps was using a figure of speech, "you know what happened," to emphasize the strength of the evidence that had been presented. He did not suggest that the members of Carter's jury did not have to keep an open mind; he asserted that the State had proved its case. Prosecutors may make such assertions. These statements were not outside the wide latitude afforded a prosecutor when discussing the evidence.

*Law of Premeditation*

Carter's second criticism of Phelps' closing argument alleges that Phelps misrepresented the law of premeditation. Phelps told the jury:

16

"Premeditation is a state of mind. A lot of people think premeditation is Trenton Custer and Kyle Carter sit down and then go over some type of plan, have some agreement in place before they commit this killing. That is not—that would be premeditation, but that is not what is required to prove premeditation. The requirement is the state of mind. This defendant has to think about the act of killing Carl Cooper before he does it. He has to consider that this is what he is going to do. It just cannot be instantaneous.

"He had more than two blocks to think about it. We will get into that, but that is what premeditation means. That is the definition of premeditation. That is what the State is required to prove; not that they sat down, worked it out, had some type of plan, but that he considered killing Carl Cooper before he did it. That intent was in his mind. It wasn't something spontaneous. Okay. Let's walk through the evidence."

A prosecutor "cross[es] the line by misstating the law." *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012). And a "defendant is denied a fair trial when a prosecutor misstates the law and the facts are such that the jury could have been confused or misled by the statement." *State v. Hall*, 292 Kan. 841, 849, 257 P.3d 272 (2011).

This court has explained premeditation as follows:

"'"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."' [Citations omitted.]'" *State v. Haberlein*, 296 Kan. 195, 205, 290 P.3d 640 (2012).

We have frequently held that a prosecutor has misstated the concept of premeditation, but often the error has been regarded as harmless. See *State v. Kettler*, 299 Kan. 448, 474-78, 325 P.3d 1075 (2014) ("half second"); *State v. Williams*, 299 Kan. 509, 545-48, 324 P.3d 1078 (2014) (same); *Hall*, 292 Kan. at 850-52, 854-56 (defendant could

17

have "'form[ed] premeditation after the pull of the first trigger, because remember, he pulls four times'"); *cf. State v. Holmes*, 272 Kan. 491, 499-500, 33 P.3d 856 (2001) ("premeditation can occur in an instant").

Although here Phelps did not say that premeditation could occur instantaneously, Carter suggests that the prosecutor argued that any lengthier contemplation necessarily meant the defendant had acted with premeditation.

Again, when we consider Phelps' statements in context, we disagree with Carter. See *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011) (context in which prosecutor makes statement "all-important"). We see no chance from that context that the jury was confused or misled into the type of binary thinking Carter's counsel is concerned with. Jurors were told that premeditation could not be formed in an instant; they were not told that any longer consideration automatically satisfied this element of the crime; they were merely directed to the evidence that Carter had ample time to premeditate killing Cooper. See *Hall*, 292 Kan. at 849 (misstatement of law that could confuse or mislead jury misconduct). Phelps' statements on premeditation were not outside the wide latitude afforded a prosecutor in discussing the evidence.

*Lack of Remorse*

Carter next argues that Phelps' statements that Carter's lack of remorse could give rise to an inference of premeditation were illogical and unsupported by Kansas law. Phelps argued, "That lack of remorse shows you, after the fact, it shows you that before the killing, he knew what he was doing and he did exactly what he set out to do." Phelps then recounted the timeline of Carter's actions after the dispatcher received the 911 call, including his statement to Sara that he had "punished" Cooper. Phelps next told the jury

18

that Carter "was proud of what he did. That lack of remorse is evidence that he did exactly what he wanted to do, which was kill Carl Cooper."

"[P]remeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a reasonable one. In such a case, the jury has the right to make the inference. [Citations omitted]." *State v. Jones*, 279 Kan. 395, 402-03, 109 P.3d 1158 (2005). Recently, in *State v. Phillips*, 299 Kan. 479, 498, 325 P.3d 1095 (2014), we reiterated factors that could be considered when determining whether evidence gives rise to an inference of premeditation. Those factors include:

> "'(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.' [Citations omitted.]" 299 Kan. at 498.

*State v. Knox*, 301 Kan. 671, 681, 347 P.3d 656 (2015).

We also stated that "the analysis of what inferences can be reasonably drawn is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation." *Phillips*, 299 Kan. at 498; *Kettler*, 299 Kan. at 467.

In our previous cases, a defendant's conduct after a killing indicative of earlier premeditation has included failure to seek medical attention for the victim, see *State v. Hill*, 290 Kan. 339, 363, 228 P.3d 1027 (2010), and attempts to cover up the killing or to destroy evidence of it, see *State v. Alvidrez*, 271 Kan. 143, 148-49, 20 P.3d 1264 (2001); *State v. White*, 263 Kan. 283, 296, 950 P.2d 1316 (1997).

19

Carter's behavior and statements after Cooper's death that show lack of remorse are in the same category as the defendant's post-killing conduct in our previous cases and could be considered by the jury for whatever weight they would bear. Carter's argument that Phelps' statements on lack of remorse were illogical suffers from the same binary thinking flaw he alleged with regard to Phelps' statements about the law of premeditation. The fact that lack of remorse may not *always* give rise to an inference of premeditation does not mean it *never* can. Under the circumstances of this case, Phelps' statements about the lack of remorse were within the wide latitude afforded a prosecutor in discussing the evidence.

*Reference to Fact Not in Evidence*

Carter next argues that Phelps referred to an extremely prejudicial fact not in evidence by saying, "So I think at this point, ladies and gentlemen, you understand how this works. We try them separately. Kyle Carter says it was Trenton Custer. Trenton Custer says it was Kyle Carter and, guess what, that is exactly why the law of aiding and abetting exists." The record contains no evidence that Custer blamed Carter for Cooper's death.

All lawyers, especially prosecutors, are prohibited from referring to facts that are not in evidence. *State v. Akins*, 298 Kan. 592, 601, 315 P.3d 868 (2014). Such remarks from prosecutors are "troubling 'because of jurors' tendency to overvalue what is effectively unsworn testimony by a highly regarded prosecutor, despite the information's worthlessness as a matter of law.' *Chanthaseng*, 293 Kan. at 147." *Akins*, 298 Kan. at 605.

We have held such unsupported statements to be prosecutorial misconduct when they dealt with defense counsel's level of experience and when they referred to a protocol

for interviewing children in cases of suspected sexual abuse as a "gold standard." See *State v. Knox*, 301 Kan. 671, 684, 347 P.3d 656 (2015); *Akins*, 298 Kan. at 601.

In this case, the State attempts to defend Phelps' statement as "simply explaining that the law of aiding and abetting exists for situations in which multiple defendants point the finger at one another in an attempt to avoid criminal liability." This may be correct as a general proposition, but that proposition begs the question. There still was no evidence that Custer ever said Carter fatally stabbed Cooper; this was a fact not in evidence, and Phelps' assertion to the contrary was misconduct and error.

Because we hold that there was error, we must move to the second step of our prosecutorial misconduct analysis. Did the error qualify as reversible plain error? Did it prejudice the jury and deny Carter a fair trial? Again, we consider three factors: whether the prosecutor's conduct was gross and flagrant, whether it evidenced ill will, and whether the evidence was so direct and overwhelming that the misconduct would have had little weight in the minds of jurors. See *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004).

Carter makes a successful argument that this remark by Phelps was gross and flagrant conduct, because the rule that closing argument cannot rely on a fact not in evidence is so old and so familiar. See *State v. Barber*, 302 Kan. 367, 380, 353 P.3d 1108 (2015) (violation of well-established law may lead to conclusion of misconduct). But the two other factors we examine on harmlessness analysis cut against reversibility. Phelps' remark was brief, unrepeated, and unemphasized. It appears to have been a spur-of-the moment, clumsy illustration of aiding and abetting rather than a crafty, deliberate tactic to obtain a conviction on the strength of nonexistent evidence. See 302 Kan. at 380 (ill will evidenced by deliberate conduct). We detect no ill will. In addition, although there was no direct evidence of who was holding the knife when Cooper was stabbed, there was

21

overwhelming evidence of Carter's participation in the chase and the attack, of sufficient time and opportunity for him to have formed premeditation, and of his incriminating behavior and statements later in the day of the murder. Under these circumstances, considering our three harmlessness criteria under the more demanding federal constitutional standard, the State has demonstrated beyond a reasonable doubt that the single error did not affect the outcome of the trial in light of the entire record; there is no reasonable possibility that the error contributed to the verdict. See *Williams*, 299 Kan. at 541.

*Adverse Comments on Carter's Choice to Testify, Credibility*

Carter next suggests that Phelps commented negatively on Carter's decision to testify and gave an improper personal view on Carter's credibility during the following exchange:

"[PROSECUTOR:]  How can you believe anything that defendant says[?] It's a third version of the events. Every time he is confronted with a new piece of evidence, you get new information from him trying to explain it away. How can you believe anything he tells you?

"[DEFENSE COUNSEL]:  Objection, that is improper argument.

"[DISTRICT JUDGE]:  It's getting very close, but I will overrule the objection. You know the issue about commenting on a witness's credibility.

"[PROSECUTOR]:  I make that comment in light of the evidence; that he has given three different versions. I want to make that clear. At what point do we say enough? At what point do we say that this is just him trying to protect himself?"

We discuss Carter's argument that Phelps commented negatively on Carter's decision to testify first.

When a "prosecutor . . . clearly suggest[s] to the jury that [a defendant] should have acceded to the State's evidence and waived his right to a jury trial because of the strength of the State's evidence against him," we have held that the prosecutor's statement fell outside the wide latitude afforded a prosecutor. *State v. Killings*, 301 Kan. 214, 231, 340 P.3d 1186 (2015); see also *State v. Snow*, 282 Kan. 323, 336-39, 144 P.3d 729 (2006) (prosecutor's argument that "'[n]ow, the defendant wants his jury trial, he's had his jury trial, and it[']s time to put an end to this nonsense'" was misconduct), *disapproved of on other grounds by State v. Guder*, 293 Kan. 763, 267 P.3d 751 (2012); *Tosh*, 278 Kan. at 90-92 (prosecutor's argument asking jury to "'[t]hink about two things. Number one, why are they bothering to do this when the Defendant confessed? And number two, is there any evidence that it didn't happen? Is there any evidence that the things she told you didn't happen?'" was misconduct). But a prosecutor is permitted to comment on inconsistencies in a defendant's statements. See *State v. Elnicki*, 279 Kan. 47, 63, 105 P.3d 1222 (2005).

We do not see a negative comment on Carter's decision to testify in the exchange quoted above. Rather, Phelps' statements were fair comment on the evidence, specifically, Carter's multiple changing versions of events.

Turning to Carter's argument that the quoted passage contains Phelps' expression of an unflattering personal opinion on Carter's credibility, we note first that a prosecutor is forbidden from accusing a defendant of lying. See *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014). And

23

"[t]he prohibition extends not only to using the word 'lie' but also to its 'derivative.' See *State v. Elnicki*, 279 Kan. 47, 62, 105 P.3d 1222 (2005) (prosecutor called defendant's testimony a 'fabrication,' 'yarn,' 'final yarn,' 'the yarn spun here,' and 'four-part yarn'); see also *Akins*, 298 Kan. at 607 (prosecutor asked did the jury 'buy' defendant's story and said his testimony was 'not credible')." *Brown*, 300 Kan. at 560.

"Nevertheless, a prosecutor has '"freedom . . . to craft an argument that includes reasonable inferences based on the evidence"' and '"when a case turns on which version of two conflicting stories is true, [to argue] certain testimony is not believable."' *State v. King*, 288 Kan. 333, 352, 204 P.3d 585 (2009) (quoting *Davis*, 275 Kan. at 121); *Pabst*, 268 Kan. at 507. For example, it is not improper for a prosecutor to offer 'comments during closing arguments regarding the witness' motivations to be untruthful.' *King*, 288 Kan. at 353; see *State v. McReynolds*, 288 Kan. 318, 326, 202 P.3d 658 (2009) (A prosecutor may offer 'the jury an explanation of "what it should look for in assessing witness credibility."'); *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008) (same). But a prosecutor must do so by basing the comment on evidence and reasonable inferences drawn from that evidence and without stating his or her own personal opinion concerning a witness' credibility or accusing a witness or defendant of lying. See *State v. Akins*, 298 Kan. 592, 606-08, 315 P.3d 868 (2014); *State v. Marshall*, 294 Kan. 850, 857, 281 P.3d 1112 (2012); *King*, 288 Kan. at 353; *Elnicki*, 279 Kan. at 60-62; *Davis*, 275 Kan. at 121; *Pabst*, 268 Kan. at 506-07." *Armstrong*, 299 Kan. at 427.

Carter's credibility-based criticism of the quoted passage also has no merit. Carter admitted that he had given three versions of events, that he had provided new information each time he was confronted with evidence, and that he told different stories to protect himself; Phelps' argument about Carter's own testimony was proper comment on this compelling evidence. See *Armstrong*, 299 Kan. at 427-29. Phelps' statements in the quoted passage were well within the wide latitude afforded a prosecutor during closing argument.

*Encouragement to Disregard District Judge's Ruling*

Carter's next two claims of prosecutorial misconduct are rooted in the following exchange:

"[DEFENSE COUNSEL:]  This is about evidence. This isn't about, you know, they could have called the cops. This isn't about, you know, I'm going to err on the side of caution. I don't know if he did it or not, but this is about evidence. This is about you being the type of juror you would want in your own case.

"[PROSECUTOR]:  Completely inappropriate comment, object.

"[DISTRICT JUDGE]:  Overruled.

"[PROSECUTOR]:  He now places the jurors in the position of the defendant.

"[DISTRICT JUDGE]:  What the attorneys say in closing arguments is not evidence."

Later, in the rebuttal portion of his closing argument, Phelps said:

"You know, it's funny that the defense would ask you if you are the type of juror that you would want to be in your case. The fact of the matter is you are not sitting over there, and that is about as appropriate as me saying are you the kind of juror that you would want to be if you were one of Carl Cooper's family members. It's completely inappropriate.

"Are you the kind of juror [who] is . . . going to look at the evidence in this case and draw conclusions about what it shows you?"

Carter claims Phelps' rebuttal statements encouraged the jury to disregard the district judge's ruling on the State's objection to defense counsel's closing argument.

A prosecutor may not tell a jury to disregard a district judge's instructions. See *State v. McCorkendale*, 267 Kan. 263, 282, 979 P.2d 1239 (1999) (error when prosecutor told jury it did not "even have to consider those lesser[]" included offense instructions because they were "thrown in to confuse you; don't consider them").

But the district judge in this case did not give an explicit instruction that Phelps told the jury to ignore. The judge did not even give an unequivocal endorsement to defense counsel's argument. Despite overruling Phelps' virtually content-free objection of "inappropriate," the judge communicated to jurors that they could properly leave aside defense counsel's suggestion that they deliberate upon Carter's fate as they wished theirs to be deliberated upon. When the suggestion was challenged, the judge pointedly stated that attorney argument was not evidence. Later, Phelps echoed the judge. He correctly redirected the jury to its duty to consider only evidence. Again, this is well within the wide latitude afforded to prosecutors.

*Invocation of Juror Sympathy for Cooper's Family*

Carter's second challenge to Phelps' rebuttal argument is that the prosecutor improperly tried to elicit sympathy for Cooper's family members.

"[I]t is well known that jurors 'must decide a case on evidence and controlling law, and not on sympathy, emotion, or prejudice.' [Citation omitted.]" *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014). Thus prosecutors are prohibited from making "'statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law.' [Citation omitted.]" 300

26

Kan. at 992. This court has held that a prosecutor committed misconduct, for example, by asking a jury to think of a victim's mother on Mother's Day, *State v. Henry*, 273 Kan. 608, 640-41, 44 P.3d 466 (2002), and to consider that the defendant's actions left two small boys without a father, *Holt*, 300 Kan. at 992-93.

Phelps' reference to Cooper's family was not remotely similar to the comments we have held to be misconduct in earlier cases. He actively discouraged jurors from behaving in a way that made Cooper's family or their presumed grief a factor in deliberations on Carter's guilt. There is simply no merit to this, the last, of Carter's prosecutorial misconduct claims.

## PRELIMINARY STATEMENT ON REASONABLE DOUBT

Carter takes issue with one of the district judge's statements to potential jurors before voir dire, "It's only if and when you are convinced beyond a reasonable doubt that what the State alleges occurred, that they have proven their case, the presumption then leaves the defendant and then your obligation becomes to vote guilty, if you are convinced beyond a reasonable doubt."

Carter did not object to this statement at the time.

"Generally, issues not raised before the trial court cannot be raised on appeal. *State v. Johnson*, 293 Kan. 959, 964, 270 P.3d 1135 (2012). When dealing with instructions given at the close of the evidence, Kansas statute mandates that we review errors asserted for the first time on appeal for clear error. See K.S.A. 22-3414(3). There is no parallel statute setting forth our standard of review for claimed errors in a trial court's preliminary instructions.

27

"We have held, however, that the clearly erroneous standard along with its availability as an exception to the contemporaneous objection rule predates its statutory codification. *State v. Williams*, 295 Kan. 506, 510-12, 286 P.3d 195 (2012). Thus, we have always reviewed unpreserved claims of instructional error—regardless of when the alleged error occurred during the trial process—for clear error. *Sams v. Commercial Standard Ins. Co.*, 157 Kan. 278, 287, 139 P.2d 859 (1943) ('[T]he general rule is that where no objection is made to the giving of an instruction during the trial and no request was made for its modification or clarification and such instruction is not clearly erroneous a litigant cannot be heard to complain on appeal.'). Finally, the clear error standard is in reality a heightened standard of harmlessness. *Williams*, 295 Kan. at 511 (clear error standard 'more akin to stating a harmless error test than a standard of review'). Thus, we must first determine whether the claimed error in the preliminary instructions was legally and factually appropriate." *State v. Tahah*, 302 Kan. 783, 793-94, 358 P.3d 819 (2015), *cert. denied* 136 S. Ct. 1218 ( 2016).

This court addressed an instruction with similar wording in *State v. Smith-Parker*, 301 Kan. 132, 340 P.3d 485 (2014). In that case, jurors were instructed that they "will" find the defendant guilty if they have no reasonable doubt on the elements of the crime. 301 Kan. at 163. We described such a statement, telling a jury it "must" or "will" find a defendant guilty, as flying "too close to the sun of directing a verdict for the State. A judge cannot compel a jury to convict, even if it finds all elements proved beyond a reasonable doubt." 301 Kan. at 164.

Here, the State attempts in vain to distinguish the district judge's use of the word "obligation" from the "must" or "will" of *Smith-Parker*. An obligation is a "legal or moral duty to do or not do something." Black's Law Dictionary 1242 (10th ed. 2014). Telling a jury it has an obligation to find a defendant guilty also all but directs a verdict for the State, and it is error.

28

But a timing distinction makes a significant difference here. The error in *Smith-Parker* surfaced at the end of trial, as deliberations began. Carter's error occurred before voir dire began. And, at the close of evidence, the district judge provided the jury a proper reasonable doubt instruction orally and in writing: "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find Kyle Carter guilty." The effect of any error before voir dire would have been tempered and quite likely erased by the later correct instruction. See *State v. Williams*, 299 Kan. 509, 548, 324 P.3d 1078 (2014) (jury presumed to follow instructions). Carter cannot meet the clear error standard for reversal based on the district judge's early, single mistake.

LESSER INCLUDED OFFENSE INSTRUCTIONS

Carter also complains that the district judge erred in failing to instruct the jury *sua sponte* on reckless second-degree murder and voluntary manslaughter.

Because Carter did not request or object to the failure to give these instructions, this court's review of the issue is again guided by K.S.A. 2015 Supp. 22-3414(3)'s clear error standard. Our analysis follows this pattern:

"When analyzing jury instruction issues, we follow a three-step process:

'(1) determining whether the appellate court can or should review the issue, *i.e.,* whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.,* whether the error can be deemed harmless.' *State v. Williams,* 295 Kan. 506, 510, 286 P.3d 195 (2012).

29

"Our first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect our reversibility inquiry at the third step." *State v. Bolze-Sann*, 302 Kan. 198, 209, 352 P.3d 511 (2015).

Regarding the first step, Carter's silence on this issue at the time of trial does not deprive us of jurisdiction to consider it. See K.S.A. 2015 Supp. 22-3414(3); *State v. Waggoner*, 297 Kan. 94, 97, 298 P.3d 333 (2013) ("failure to object to an instruction does not prevent appellate review").

On the second step, determining whether there was any error, we consider whether the subject instruction was legally and factually appropriate. See *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 (2015). A reviewing court "'should use an unlimited review to determine whether the instruction was legally appropriate.'" *State v. Brownlee*, 302 Kan. 491, 511, 354 P.3d 525 (2015) (quoting *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012]). When analyzing whether the instruction is factually appropriate, "'the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction.'" *Brownlee*, 302 Kan. at 511 (quoting *Plummer*, 295 Kan. 156, Syl. ¶ 1).

Carter's jury received a lesser included instruction on intentional second-degree murder. This court has recognized five degrees of homicide, in descending order of seriousness: capital murder, first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. *State v. Cheever*, 295 Kan. 229, 258-59, 284 P.3d 1007 (2012) (adding capital murder to homicide hierarchy), *vacated on other grounds and remanded* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013). Based on this hierarchy, reckless second-degree murder and voluntary manslaughter are both lesser included offenses of first-degree murder under K.S.A. 2015 Supp. 21-5109(b)(1). Each

was therefore legally appropriate. See *Killings*, 301 Kan. at 222. We now turn to the question of whether either was factually appropriate.

*Reckless Second-Degree Murder*

Reckless second-degree murder is the killing of a human being committed unintentionally but recklessly under circumstances that manifest extreme indifference to the value of human life. K.S.A. 2015 Supp. 21-5403(a)(2).

> "With regard to whether such an instruction would have been factually appropriate, this court stated in *State v. Deal*, 293 Kan. 872, 884, 269 P.3d 1282 (2012), that second-degree reckless murder is a killing of a human that is not purposeful, willful, or knowing but which results from an act performed with knowledge that the victim is in imminent danger, although death is not foreseen." *Killings*, 301 Kan. at 225-26.

This court has often had the opportunity to consider whether a reckless second-degree murder instruction was factually appropriate. And we have consistently held that the instruction is not appropriate when the only inference supported by the evidence is that the defendant intended to kill his or her victim. See *Killings*, 301 Kan. at 227 (defendant went to victim's apartment to "exact revenge"; pointed gun at victim; taunted victim; fired multiple shots at victim); *State v. Maestas*, 298 Kan. 765, 780, 316 P.3d 724 (2014) (defendant "saw his mother asleep in her bed before he entered her room and stabbed her approximately 150 times in the head, neck, and chest, even as she pleaded with him to stop"); *State v. Cavaness*, 278 Kan. 469, 477, 101 P.3d 717 (2004) (defendant beat, tortured victim); *State v. Calderon*, 270 Kan. 241, 256, 13 P.3d 871 (2000) (defendant stabbed victim in stomach, severing aorta; defendant's self-serving statement that he meant only to stab victim's arm insufficient to justify reckless second-degree murder instruction); *State v. Clark*, 261 Kan. 460, 466, 931 P.2d 664 (1997) (muzzle of gun "closely pressed against" victim's temple when defendant fired shot; defendant's self-

31

serving statement that gun accidentally contacted victim's head and went off insufficient to justify reckless second-degree murder instruction); see also *State v. Longoria*, 301 Kan. 489, 514-16, 343 P.3d 1128 (2015) (factual appropriateness of instruction not addressed; defendant could not establish any error clear).

This court also has had multiple opportunities to consider the sufficiency of evidence supporting a conviction for reckless second-degree murder. We have held that evidence was sufficient to show a defendant's knowledge of imminent danger although death was not necessarily foreseen when a defendant beat a victim with a crowbar, *State v. Deal*, 293 Kan. 872, 885-86, 269 P.3d 1282 (2012); when a defendant fired into darkness in the direction of a vehicle he knew to be occupied, *State v. Cordray,* 277 Kan. 43, 56, 82 P.3d 503 (2004); and when a defendant shot randomly and without aiming, *State v. Jones*, 27 Kan. App. 2d 910, 915, 8 P.3d 1282 (2000).

The State's argument on this issue concentrates on the number and depth of Cooper's wounds, one in the back and two in the thigh, but we must focus on whether Cooper's "killing [was] intentional or unintentional, not on whether a deliberate and voluntary act leads to death." *Deal*, 293 Kan. at 885. This standard demands that we look at all of the events leading to the stabbing. Those events include Carter and Custer witnessing Cooper breaking into their friend's car, their pursuit of him, and the brief physical fight in which someone stabbed Cooper three times. Carter and Custer then left the scene. These facts lead us to hold that a jury could reasonably have found that Carter acted recklessly, and an instruction on reckless second-degree murder was factually appropriate.

The third step of our analysis requires us to consider reversibility. Carter must firmly convince us that "'the jury would have reached a different verdict'" had the instruction been given. *Smith-Parker*, 301 Kan. at 164.

Carter has not met this burden. Although a reasonable jury *could* have reached a different verdict, the amount of time the pursuit required, the extreme force with which Cooper's wounds were inflicted, and the callousness Carter voiced and displayed are among the pieces of evidence that undercut any claim that Carter's jury *would* have reached a different verdict had it been instructed on reckless second-degree murder.

We also are persuaded to hold there is no clear error by the logic behind what used to be referred to as the "skip rule." See *State v. Williams*, 303 Kan. 585, 599-600, 363 P.3d 1101 (2016). The substance of the skip rule is that "'[w]hen a lesser included offense has been the subject of an instruction, and the jury convicts of the greater offense, error resulting from failure to give an instruction on another still lesser included offense is cured.'" *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 (2004) (quoting *Easter v. State*, 306 Ark. 615, 620, 816 S.W.2d 602 [1991]). Strictly speaking, reckless second-degree murder is not "another still lesser included offense" of intentional second-degree murder. But intentional second-degree murder and reckless second-degree murder are assigned different severity levels, see K.S.A. 2015 Supp. 21-5403(b) (intentional severity level 1, person felony; reckless severity level 2, person felony), with reckless designated as the less serious crime. *State v. Bernhardt*, 304 Kan. 460, 474, 372 P.3d 1161 (2016). Carter's jury received an instruction on intentional second-degree murder and it was, as is typical, instructed to consider the possible crimes of conviction in the order of severity, highest to lowest. The fact that Carter's jury found him guilty of premeditated first-degree murder means it never reached intentional second-degree murder and, likewise, would not have reached reckless second-degree murder. Reversal for the judge's failure to instruct *sua sponte* on reckless second-degree murder is not required.

33

*Voluntary Manslaughter*

Carter also argues he was entitled to a jury instruction on voluntary manslaughter—specifically, the form defined as "knowingly killing a human being committed . . . [u]pon a sudden quarrel or in the heat of passion." K.S.A. 2015 Supp. 21-5404(a)(1).

This court has recently explained:

"'"Sudden quarrel is one form of provocation for 'heat of passion' and is not separate and apart from 'heat of passion.'"' *State v. Johnson*, 290 Kan. 1038, 1047, 236 P.3d 517 (2010) (quoting *State v. Coop*, 223 Kan. 302, 307, 573 P.2d 1017 [1978]). The provocation—whether it be 'sudden quarrel' or some other form of provocation—must be sufficient to cause an ordinary person to lose control of his or her actions and reason. *Johnson*, 290 Kan. at 1047. The test is objective, not subjective. *State v. Hill*, 290 Kan. 339, 356, 228 P.3d 1027 (2010). In addition, we have defined 'heat of passion' as '"'any intense or vehement emotional excitement of the kind prompting violent and aggressive action.'" [Citations omitted.]' *Wade*, 295 Kan. at 925. 'The hallmark of heat of passion is taking action upon impulse without reflection.' 295 Kan. at 925. It '"includes an emotional state of mind characterized by anger, rage, hatred, furious resentment, or terror."' *Coop*, 223 Kan. 302, Syl. ¶ 1." *State v. Story*, 300 Kan.702, 711, 334 P.3d 297 (2014).

"In order that a court be required to instruct on voluntary manslaughter committed in the heat of passion, the evidence must show that the heat of passion alleged resulted from severe provocation sufficient to cause an ordinary person to lose control of his or her actions or reason. See *State v. Follin*, 263 Kan. 28, 34, 947 P.2d 8 (1997). The provocation must consist of more than mere words or gestures. *State v. Clark*, 261 Kan. 460, 467, 931 P.2d 664 (1997)." *State v. Evans*, 270 Kan. 585, 588, 17 P.3d 340 (2001).

34

Carter argues the evidence in his case showed sufficient provocation because he had witnessed Cooper burglarizing the vehicle of his close friend. This is plainly inadequate to meet the objective standard. "The passion aroused by the provocation must be sufficiently extreme to dethrone reason and prevent cool reflection." 2 Torcia, Wharton's Criminal Law § 156 (15th ed. 1994). Moreover, Carter never testified that, even subjectively, he was overcome by heat of passion; he testified only that he was "dumbfounded" by Cooper's action. Dumbfounded is not deprived of reason. A voluntary manslaughter instruction was not factually appropriate.

## AIDING AND ABETTING INSTRUCTION

Carter also challenges the adequacy of an additional aiding and abetting instruction given in his case, arguing the district judge should have added that "mere association or presence is insufficient to establish guilt as an aider or abettor." His failure to seek the additional language at trial does not deprive us of jurisdiction but makes clear error the applicable standard. See K.S.A. 2015 Supp. 22-3414(3); *Waggoner*, 297 Kan. at 97.

The additional language is, in general, a correct statement of Kansas law. See *State v. Hilt*, 299 Kan. 176, 185, 322 P.3d 367 (2014); *State v. Jefferson*, 297 Kan. 1151, 1167-68, 310 P.3d 331 (2013). And Carter is not the first defendant to challenge its exclusion from an instruction. See, *e.g., State v. Edwards*, 291 Kan. 532, 551-52, 243 P.3d 683 (2010) (refusal to include language not reversible); *State v. Holt*, 285 Kan. 760, 771-72, 175 P.3d 239 (2008) (refusal to include language not error); *State v. Davis*, 283 Kan. 569, 581-83, 158 P.3d 317 (2006) (refusal to include language not reversible). Recently we have gone so far as to describe inclusion of the language as "the better practice" and cautioned that "failure to do so may imperil convictions in future similar cases. See *State v. Llamas*, 298 Kan. 246, 258-62, 311 P.3d 399 (2013)." *Hilt*, 299 Kan. at 185-86.

The problem for Carter is that his case does not qualify as "similar." The additional language would have been factually inappropriate here. According to Carter's own testimony, he was not merely present or associated with Custer. He actively participated in chasing and accosting and beating Cooper. He denied knifing him. But he was far more than one who innocently found himself in the wrong place with the wrong person at the wrong time.

CUMULATIVE ERROR

Carter's final appellate issue is based on the doctrine of cumulative error.

"Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009)." *State v. Hart*, 297 Kan. 494, 513-14, 301 P.3d 1279 (2013).

We have identified three errors: the prosecutor's reference to a fact not in evidence, the district judge's erroneous preliminary statement on reasonable doubt, and the omission of an instruction on reckless second-degree murder. None of these errors is reversible standing alone.

Given the abundant evidence against Carter, even when the three errors are considered together, they do not necessitate reversal. The errors were not mutually reinforcing; the prosecutor's misconduct was brief and unrepeated; the judge's pre-deliberation reasonable doubt instruction undoubtedly had a curative impact on his preliminary misstatement; and the jury's choice to convict of the greatest offense rather

than a functional intervening lesser included offense of intentional second-degree murder showed it would not have been affected by inclusion of a reckless second-degree murder instruction. See *State v. Tully*, 293 Kan. 176, 205-06, 262 P.3d 314 (2011) (efficacy of remedial efforts, interrelationship of errors relevant to cumulative error analysis). Carter was not entitled to a perfect trial, and he received a fair one. See *State v. Todd*, 299 Kan. 263, 286-87, 323 P.3d 829 (2014).

CONCLUSION

Defendant Kyle Carter has not persuaded this court that his conviction for premeditated first-degree murder was infected by reversible error. The judgment of the district court is affirmed.