NOT DESIGNATED FOR PUBLICATION

No. 116,171

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

EUSEBIO CASTILLO-CALLES,
*Appellant*.


MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Opinion filed March 16, 2018. Affirmed in part, reversed in part, and remanded for resentencing.

*Christina M. Kerls*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before ARNOLD-BURGER, C.J., STANDRIDGE and BRUNS, JJ.


PER CURIAM: Eusebio Castillo-Calles appeals his conviction and sentence for one count of aggravated indecent liberties with a child. Castillo-Calles alleges three instances of prosecutorial error deprived him of a fair trial. He also challenges his sentence, arguing that the district court imposed an upward departure sentence without finding any aggravating circumstances. For the reasons stated below, we affirm Castillo-Calles' conviction but remand for resentencing.

FACTS

Castillo-Calles was convicted by a jury of aggravated indecent liberties with a child. The victim, I.W., was 12 years old at the time of the events leading to the charge. I.W. was friends with C.P., who lived with Castillo-Calles (her stepfather) and her mother.

On March 24, 2013, I.W. spent the night at C.P.'s house. That afternoon, C.P., I.W., and Castillo-Calles played hide and seek. I.W. testified at trial that, while hiding with Castillo-Calles behind the water heater in the basement, he kissed her neck. Castillo-Calles denied kissing I.W. during the game.

At some point later that day, I.W. dropped her Kindle, cracking it. That evening, when I.W. and C.P. went to bed, they were making noise. Castillo-Calles went to C.P.'s bedroom to tell them to quiet down and found them eating cookies and chips in the bedroom. Castillo-Calles told them they were not allowed to have food in the bedroom and took it from them. I.W. and C.P. went to sleep on C.P.'s bed, the mattress of which previously belonged to Castillo-Calles.

At about 5:00 the next morning, C.P.'s mother asked Castillo-Calles to leave their bedroom because his snoring was keeping her awake. Castillo-Calles went to C.P.'s room and laid down on the bed in which C.P. and I.W. were sleeping.

At trial, I.W. testified that Castillo-Calles got up from C.P.'s side of the bed and laid down next to I.W., who was laying on her right side. She stated that Castillo-Calles put his hands under her pajama shirt and "started playing with [her] boobs." She testified he lifted up her shirt and kissed her left breast. I.W. claimed Castillo-Calles asked her to go to another room, but she told him she was tired.

2

Castillo-Calles testified at trial that he fell asleep on C.P.'s bed, and C.P. woke him up because he was snoring. Shortly thereafter, C.P.'s mother came to get him up to go outside and start the car and sweep the snow before she went to work at 6 a.m. Castillo-Calles stated he did not touch I.W.

C.P. testified at trial that she woke up when Castillo-Calles came into her room, and she could not get back to sleep because he was snoring. C.P. recalled that Flores came and woke Castillo-Calles up to ask him to scrape snow off her car. C.P. testified that I.W. asked her the next morning if C.P. thought her dad touched I.W., and C.P. replied, "'No, that's crazy.'" C.P. testified at trial that she knew Castillo-Calles did not touch I.W.

I.W. went home the morning of March 25, 2013, and told her mother that Castillo-Calles had touched her inappropriately. Flack reported I.W.'s allegation to the police that afternoon. The Overland Park Police Department initiated an investigation.

The same evening Flack made her report, an officer from the Overland Park Police Department swabbed I.W.'s left nipple to obtain a DNA sample for analysis. The Johnson County Crime Laboratory tested the sample for saliva and for DNA matches. The presumptive test for saliva was negative. The DNA test results showed at least three contributors to the DNA sample taken from I.W.'s breast, the major contributor of which matched Castillo-Calles. The prosecution and defense each presented expert testimony at trial regarding the results of the DNA test.

Defense counsel argued to the jury that the DNA could have been transferred to I.W. from Castillo-Calles' old mattress, upon which I.W. and C.P. were sleeping. The defense presented expert testimony from Robert Booth, a retired DNA analyst who had worked for the Kansas City, Missouri, crime laboratory for 29 years. Booth testified that people leave DNA wherever they go, and that a person's DNA accumulates in places

3

where a person stays for a long time, such as a bed. Booth stated DNA is so small that it would fit through threads in a sheet. Booth explained that DNA is a very stable chemical over time and that it could remain in sheets even after they were washed. He explained that DNA is transferrable based on contact.

The prosecution presented expert testimony from Ashley Clark, the forensic DNA analyst at the Johnson County Crime Laboratory who performed the DNA analysis. Clark explained that dry DNA may not transfer, so the lab wets any swab used to collect DNA samples. Clark testified that she would expect a shirt to block DNA from transferring to a person's skin. Finally, she said that DNA can be removed or destroyed by cleaning, and that over time DNA can be degraded or wiped away.

Clark also was questioned about how DNA is transferred from person to person, including the difference between initial and secondary transfers. An initial transfer occurs, for example, when a person touches an object and leaves his or her DNA; a secondary transfer occurs when a second person later touches the same object and the first person's DNA is transferred to the second person. Clark testified that she would not necessarily expect the first person's DNA to transfer to the second person from a secondary transfer. If the DNA did transfer, Clark would not expect the first person's DNA to be the major source of DNA in a sample of the second person's skin—she would expect the major contributor to be the second person's own DNA. As applied to this case, Clark testified that since the DNA sample was taken from I.W.'s breast, she would expect that I.W. would be the major contributor of DNA, not Castillo-Calles.

The prosecution argued to the jury that the defense theory was "highly unlikely" based on the evidence in the case: Castillo-Calles' DNA would have had to remain on the mattress that he no longer used and on the sheets that had been washed; the DNA would have had to transfer to I.W.'s skin through her pajama shirt when the DNA was dry; and I.W. would have had to make up a story about Castillo-Calles kissing her breast and ask

4

the police to swab a part of her body where Castillo-Calles' DNA happened to have been transferred to her skin.

The jury convicted Castillo-Calles, as charged, of aggravated indecent liberties with a child. At sentencing, the district judge granted Castillo-Calles' motion for downward durational departure from a hard 25 Jessica's Law sentence and sentenced him to 120 months in prison. Castillo-Calles timely appealed.

ANALYSIS

1. *Prosecutorial error*

Castillo-Calles alleges three instances of prosecutorial error, each of which he claims prejudiced his due process right to a fair trial. Although Castillo-Calles did not object at trial to the alleged errors, an objection is generally not necessary to preserve a claim of prosecutorial error during closing argument. See *State v. Pribble*, 304 Kan. 824, 831, 375 P.3d 966 (2016).

This court reviews claims of prosecutorial error in two steps. First, we must decide whether prosecutorial error occurred. To do so, we must determine whether the challenged act fell outside the "wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Second, if there was error, we determine whether it prejudiced the defendant's due process right to a fair trial by using the constitutional harmlessness inquiry. 305 Kan. at 109.

Having set forth the standard of review, we turn to Castillo-Calles' three claims of prosecutorial error:  (1) commenting on the credibility of the defense expert witness, (2)

5

referring to facts not in the evidence, and (3) commenting on Castillo-Calles' invocation of his right to counsel. We address each of these claims of error in turn.

a. *Commenting on the credibility of the defense expert witness*

Castillo-Calles argues the prosecutor erred in closing argument by expressing his personal opinion about the credibility of Booth, the defense expert witness. Specifically, Castillo-Calles contends the prosecutor "essentially informed the jury that the defense could not be believed."

Prosecutors generally have wide latitude to craft arguments that incorporate reasonable inferences based on the evidence presented. *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011); *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 (2009). This latitude includes explaining to the jury what it should look for in assessing witness credibility. 288 Kan. at 326; *State v. Scaife*, 286 Kan. 614, 623-24, 186 P.3d 755 (2008). But prosecutors may not offer their personal opinions about the credibility of a witness to the jury. "[E]xpressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony, not commentary on the evidence of the case." *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000).

When a case turns on which version of two conflicting stories is true, prosecutors may argue that certain testimony is not believable. But a prosecutor "must do so by basing the comment on evidence and reasonable inferences drawn from that evidence and without stating his or her own personal opinion concerning a witness' credibility or accusing a witness or defendant of lying." *State v. Ortega*, 300 Kan. 761, 775, 335 P.3d 93 (2014). The ultimate conclusion as to any witness' veracity rests solely with the jury. *Pabst*, 268 Kan. at 507.

6

Counsels' comments are considered in the context in which they are made, not in isolation. *State v. Duong*, 292 Kan. 824, 831, 257 P.3d 309 (2011); *State v. Stone*, 291 Kan. 13, 19-20, 237 P.3d 1229 (2010). Comments about credibility are less troublesome when accompanied by a discussion of the evidence presented at trial. See, e.g., *Chanthaseng*, 293 Kan. at 148 ("[T]his all-important context persuades us that the prosecutor was merely asking the jury to draw permissible inferences from that evidence.").

In this case, the jury heard different theories from the prosecution and the defense to explain why Castillo-Calles was identified as the major contributor of DNA to the sample taken from I.W.'s breast. The defense theory was based on Booth's expert testimony. Castillo-Calles challenges three of the prosecutor's comments in his closing argument as improper comments on Booth's credibility as an expert witness. The challenged statements are emphasized by italics below in the context in which they were made:

- "You heard somebody say that there's no corroborating evidence. *The corroborating evidence to the girl's statement is the DNA. The DNA in this case that you heard about. You heard people testify about how it would get there, and you've heard an implausible story about how it might have ended up on her left nipple.*"
- "Let's go back to how you do DNA testing. When there is DNA on a surface, everybody involved in doing this has told you, what's the first thing you do? You wet the swab.

  "Why do you do that? In order to draw out the dry evidence, the dry DNA.

  "So if you believe that it's his old DNA that has stayed there for months and months and months after the sheets have been washed, it's still dried DNA. It has to be wet down in order to draw it out.

  "What evidence is there that there was any wetness when [I.W.] was in that bed that would have drawn it out? Because it's just dried DNA, invisible DNA. I think that's what [defense counsel] and Mr. Booth, his paid consultant, said. That it's drying, it's invisible, and it's imbedded in the webbing in those sheets that have been washed.

7

"Reasonable doubts, folks, you can apply your common sense. *Reasonable doubt doesn't require you to seek out an implausible story as to how the DNA, his DNA, ends up on that little girl's left boob or breast or whatever a little girl of 12 calls it. It doesn't require you to seek out an alternative, an implausible explanation.* Especially when he is the major contributor, which is even their own expert said.

"According to the study, you would not expect that when you're dealing with two transfers, not one but two. And, folks, through a shirt. How does that happen through a shirt? That's just implausible, if not ridiculous."

- "His DNA is on her breast. . . .

"What they want you to believe is this little girl of 12 years old concocts this story because she wants to not get in trouble for breaking her Kindle, which she got in trouble for by the way, because she's the one that told her mom. That's what the evidence is. Or because she got caught eating cookies or Cheetos or whatever it is. So she concocts this story, and this little girl of 12 is smart enough or lucky enough to put her boob. Because she would have had to put her boob, and she would have had to maybe lick it herself to get it wet in order to get that dry DNA up. Well, oh yeah, she had a shirt on, but she would have had to have done that and be lucky enough to find the point in the bed where the invisible DNA exists.

"*If you believe that, I mean seriously, if you believe that, what other evidence could there be that could ever have ever been presented to a jury who is going to believe a story like that?*"

. . . .

"We are dealing with two transfers of DNA on sheets that have been washed since that time.

. . . .

"You heard from both of these DNA analysts that it's—you wouldn't expect to see that major contributor in a situation where you're dealing with not just one transfer, but two transfers.

"But then again, folks, this little girl because she didn't want to get, this troubled young girl, didn't want to get in trouble. So two and a half years later she's still telling you that this is what happened to her.

"She was lucky enough to put her boob in the invisible DNA on the bed sheet that has been washed that would pick it up when it's dry DNA. Oh, yeah, and she had a shirt on." (Emphases added.)

8

Castillo-Calles contends that the prosecutor's repeated accusation that Booth's testimony was "implausible" was improper. But when read in the context of the surrounding argument, the prosecutor's statements explained to the jury some of the legitimate factors it could consider in assessing Booth's testimony and drew the jurors' attention to specific evidence that questioned the defense theory of the DNA evidence. See *Scaife*, 286 Kan. 614, Syl. ¶ 5 (prosecutor may explain legitimate factors that jury may consider in addressing witness credibility and may argue why factors should lead to compelling inference of truthfulness). The prosecutor's remarks did not disparage or comment on Booth's personal credibility but, rather, argued that the prosecution's explanation of the DNA evidence was more believable than the account presented by the defense through Booth's testimony. The jury had to determine for itself whether Booth was credible. It was not improper for the prosecutor to argue that the defense's explanation was implausible based on the evidence presented in this case.

We find some guidance from our Supreme Court in *Chanthaseng*, 293 Kan. at 143, where a prosecutor directly "mentioned [a witness'] credibility five times during her closing argument." Unlike the present case, the prosecutor in *Chanthaseng* attributed the lack of credibility to the witness herself, not to a statement made by the witness. Specifically, the prosecutor in *Chanthaseng* argued "'she is a credible witness,'" and "'[s]he is credible,'" and "'she is credible,'" and "'[s]he's credible,'" and "'the quality of what her . . . personality is like makes her more credible.'" 293 Kan. at 143. Even in that situation our Supreme Court found no error because each argument "was accompanied by a discussion of the evidence presented at trial." 293 Kan. at 148. Each argument was therefore distinguishable from "its improper twin, argument on the prosecutor's personal belief or opinion about a witness' credibility." 293 Kan. at 148.

Based on the facts presented and the applicable law, we find the prosecutor's comments did not constitute prohibited personal opinion on the expert's credibility. The

9

comments were fair argument and fell within the wide latitude to craft arguments that incorporate reasonable inferences based on evidence presented.

b. *Commenting on facts not in evidence*

In his second claim of prosecutorial error, Castillo-Calles contends the prosecutor made the following statements about Booth, his DNA expert, which are not supported by any evidence introduced at trial:  "You are listening to, or heard from a guy, who hasn't, with all due respect for him, he hasn't done DNA work for seven or eight years, which is a hundred years in DNA." Specifically, Castillo-Calles asserts that "no witness ever testified that not working with DNA for seven or eight years was the equivalent of 100 years when talking about DNA."

Again, the wide latitude allowed prosecutors in crafting closing arguments includes allowing a prosecutor to make reasonable inferences based on the evidence. *Chanthaseng*, 293 Kan. at 148. However, the arguments must remain consistent with the evidence and may not refer to facts outside the evidence. *State v. McCrary*, 267 Kan. 339, 351, 979 P.2d 134 (1999). When a prosecutor argues facts that are not in evidence, error occurs, and the first prong of the test for prosecutorial error has been met. See *State v. Akins*, 298 Kan. 592, 601, 315 P.3d 868 (2014).

Here, the prosecutor's comment that Booth "hasn't done DNA work for seven or eight years, which is a hundred years in DNA," is inconsistent with the evidence. First, Booth did not testify that he had not done "DNA work" since his 2008 retirement from the Kansas City, Missouri, crime laboratory. To the contrary, Booth testified that since retiring he has testified in cases he had previously worked in the lab and also consulted for prosecution and defense attorneys in criminal matters regarding DNA analysis.

10

Second, the prosecutor's comment that "seven or eight years" is equivalent to "a hundred years when talking about DNA" suggested to the jury that Booth did not have expertise regarding modern DNA analysis. But the State did not challenge Booth's qualifications at trial. In fact, the State offered at trial to "stipulate to Mr. Booth's expertise in this area." Booth stated he has testified as an expert in DNA analysis well over 500 times. Castillo-Calles has established error on this point. See *Akins*, 298 Kan. at 601 (error established where prosecutor argues facts not in evidence).

Having found prosecutorial error, this court must determine whether the error deprived Castillo-Calles of a fair trial. To do so, it must apply the constitutional harmlessness test. *Sherman*, 305 Kan. at 109. Prosecutorial error is harmless only if the State can demonstrate "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, whether there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]). Appellate courts must consider all alleged indicators of prejudice to determine whether there is no reasonable possibility that the error contributed to the verdict. *Sherman*, 305 Kan. at 111.

The State contends that even if the court finds prosecutorial error, the error was harmless because the evidence of guilt in this case was overwhelming. While this is a close case, we ultimately agree.

The DNA evidence was key to this case. The prosecution and defense each presented expert testimony to the jury in support of their competing explanations on the issue. The State did not object to Booth's qualifications or question his DNA work since his 2008 retirement. The State did not produce any evidence that would cause the jury to question the defense expert's qualifications or expertise. The only thing the jury could rely on to draw the conclusion that Booth was unqualified to provide an opinion on modern DNA analysis was the State's comment in closing argument. Although it is

11

reasonable to believe that the prosecutor's comment could have caused the jury to question Booth's credibility based on facts not in the evidence, the totality of the evidence presented in this case overwhelmingly supported the prosecution's version of events. *Sherman*, 305 Kan. at 109 (this court views error in light of entire record to assess harmlessness).

In support of defense counsel's argument that Castillo-Calles' DNA could have remained on his old mattress and sheets, Booth testified that DNA is ubiquitous and stable. But Clark testified that DNA can be destroyed or removed by cleaning. Clark also testified that she would expect a shirt to block DNA from transferring to a person's skin, and that she would expect I.W.'s own DNA to be the major contributor to the sample taken from her skin, not Castillo-Calles' DNA. The defense did not explain to the jury, through Booth or any other witness, how dried DNA from Castillo-Calles' old mattress or from sheets that had been washed could have been transferred through I.W.'s pajama shirt onto her breast in a large enough quantity for Castillo-Calles' DNA to test as the major contributor of DNA to the sample of I.W.'s skin. In fact, Booth acknowledged that DNA must be wet to transfer and that it would be "unusual" for a secondary transfer to result in the first person's DNA being the major contributor to the sample from the second person's skin. And, as the prosecution argued, it would be unlikely for I.W. to fabricate a story that Castillo-Calles kissed her left breast, and then have a subsequent DNA test just happen to confirm that Castillo-Calles was the major contributor of DNA on that breast. The defense failed to address this issue at all.

Even if the jury questioned Booth's expertise based on the prosecutor's erroneous statement, we find the State has shown no reasonable possibility that the error contributed to the verdict based on the overwhelming evidence. *Sherman*, 305 Kan. at 109. Moreover, the jurors heard only an isolated comment questioning Booth's qualifications, which was not emphasized by the State. And the jury instructions mitigated the impact of the prosecutor's statement. The district court instructed the jury:  "Statements, arguments, and

12

remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." It is presumed that the jury followed the district court's instructions. See *State v. Wilson*, 295 Kan. 605, 621, 289 P.3d 1082 (2012). Accordingly, when viewed in light of the entire record, the prosecutor's error in commenting on facts outside the evidence was harmless. In context, the prosecutor's isolated comment about Booth did not deprive Castillo-Calles of a fair trial.

c. *Commenting on Castillo-Calles' invocation of his right to counsel*

Finally, Castillo-Calles alleges the prosecutor improperly elicited testimony from an Overland Park detective that Castillo-Calles had invoked his right to counsel. The challenged testimony is as follows:

"[Prosecutor]:  Later that day did you receive a call from someone?
"[Detective]:  Yes, I did.
"[Prosecutor]:  Who did you receive a call from?
"[Detective]:  An attorney, Chris Fletcher.
"[Prosecutor]:  What did Mr. Fletcher tell you?
"[Detective]:  He left me a voicemail saying that he was now representing the whole family and to cease contact.
"[Prosecutor]:  Now, at some point did you obtain the DNA—did you go and ask to obtain a DNA sample from Mr. Castillo-Calles?
"[Detective]:  Yes.
"[Prosecutor]:  Were you eventually able to obtain a DNA sample?
"[Detective]:  Yes.
"[Prosecutor]:  When did this take place?
"[Detective]:  This was, I think, in July or August at this point.
"[Prosecutor]:  Were several attempts made to obtain this DNA sample from Mr. Castillo-Calles?
"[Detective]:  Yes.

"[Prosecutor]:    But, nevertheless, you obtained it sometime. When was it?

"[Detective]:    I'd have to look at the record for a specific date, but I think it was July or August at this point.

"[Prosecutor]:    When you obtained this profile, or sample, how did you go about getting it? How did you do it?

"[Detective]:    I obtained a search warrant, and then Mr. Castillo-Calles and his attorney Mr. Fletcher responded to my station and provided the sample."

Castillo-Calles claims this testimony violated the rule that prosecutors may not elicit evidence that a defendant invoked his right to counsel. In *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the United States Supreme Court held a defendant's invocation of his or her right to silence should not be used against the defendant at trial. The rule also applies when the State attempts to impeach a defendant's credibility by arguing that the invocation of his or her right to counsel evidences guilt. *State v. Cosby*, 285 Kan. 230, 245, 169 P.3d 1128 (2007); *State v. Edwards*, 264 Kan. 177, Syl. ¶ 8, 955 P.2d 1276 (1998).

The State contends that *Doyle* is inapplicable to this case because Castillo-Calles was not in custody when he invoked his right to counsel. However, this court need not address the merits of this issue because Castillo-Calles did not object to the prosecutor's questions at trial and therefore may not raise this issue on appeal. K.S.A. 60-404 dictates that evidentiary challenges shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial. The district court must be provided the specific objection so it may consider as fully as possible whether the evidence should be admitted and therefore reduce the chances of reversible error. *State v. Richmond*, 289 Kan. 419, 429, 212 P.3d 165 (2009).

In *State v. King*, 288 Kan. 333, 204 P.3d 585 (2009), our Supreme Court considered the necessity of a contemporaneous objection to preserve claims of prosecutorial error under *Doyle*. In that case, King argued for the first time on appeal that

14

the prosecutor erred by asking him a series of questions in violation of *Doyle* during cross-examination. The court acknowledged the potential conflict between the K.S.A. 60-404 contemporaneous objection requirement to preserve evidentiary claims and the appellate courts' prior practice of reviewing all claims of prosecutorial error regardless of whether a contemporaneous objection has been raised. The court resolved the conflict by holding that "[a]lleged *Doyle* violations that occur during a prosecutor's questioning of a witness involve the improper admission of impeachment evidence; thus, appellate review of such conduct is subject to the contemporaneous-objection rule in K.S.A. 60-404." *King*, 288 Kan. 334, Syl. ¶ 7. Because King failed to object to the prosecutor's questions at trial, the contemporaneous-objection rule of K.S.A. 60-404 foreclosed consideration of the issue for the first time on appeal. 288 Kan. at 340.

Accordingly, Castillo-Calles did not preserve this issue and this court should not consider this argument for the first time on appeal. See *State v. Love*, 305 Kan. 716, 729, 387 P.3d 820 (2017) (finding defendant's failure to lodge contemporaneous objection to question-and-answer testimonial exchange constitutes fundamental defect in defendant's claim of prosecutorial error); *State v. Bennington*, 293 Kan. 503, 529, 264 P.3d 440 (2011) ("'[C]ontemporaneous objection must be made to all evidentiary claims— including those alleging prosecutorial misconduct.'"); *State v. Shadden*, 290 Kan. 803, 835, 235 P.3d 436 (2010) (same); *King*, 288 Kan. at 349 ("From today forward, in accordance with the plain language of K.S.A. 60-404, evidentiary claims—including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal.").

2. *Departure sentence*

In his final issue on appeal, Castillo-Calles argues that he is serving an illegal sentence because the district court imposed an upward departure from his Kansas

Sentencing Guidelines Act (KSGA) sentence without citing substantial and compelling reasons for that departure, as required under K.S.A. 2017 Supp. 21-6815(a). We agree and therefore remand for resentencing.

Whether a sentence is illegal is a question of law over which an appellate court has unlimited review. *State v. Moncla*, 301 Kan. 549, 551, 343 P.3d 1161 (2015). A sentence that does not conform to the applicable statutory provision, either in character or the term of authorized punishment, is illegal under K.S.A. 2017 Supp. 22-3504(3). *Moncla*, 301 Kan. at 551. A defendant can challenge an illegal sentence at any time. K.S.A. 2017 Supp. 22-3504(1).

Castillo-Calles was convicted of aggravated indecent liberties with a child, an off-grid person felony. Under Jessica's Law, the sentence for a defendant who is 18 years of age or older is life imprisonment with a mandatory minimum of 25 years. K.S.A. 2017 Supp. 21-6627(a)(1)(C). Prior to sentencing, Castillo-Calles moved for a downward departure from the Jessica's Law sentence to the KSGA sentencing grid.

A district court may grant a departure from a Jessica's Law sentence to the presumptive guidelines sentence applicable to the crime if the defendant is a first-time offender and the court finds substantial and compelling mitigating factors. If departure is granted, "the judge shall state on the record at the time of sentencing the substantial and compelling reasons for the departure." K.S.A. 2017 Supp. 21-6627(d)(1).

Once the sentence becomes a guidelines sentence, the district court may depart from the guidelines sentence to another sentence. *State v. Jolly*, 291 Kan. 842, 847, 249 P.3d 421 (2011). "If the sentencing judge departs from the presumptive sentence, the judge shall state on the record at the time of sentencing the substantial and compelling reasons for the departure." K.S.A. 2017 Supp. 21-6815(a). In other words, when a district court makes a double departure—first from the mandatory off-grid sentence under

16

Jessica's Law to the presumptive guidelines sentence, and second from the guidelines sentence to another sentence—the judge must state on the record the substantial and compelling reasons for each step. *State v. Jackson*, 297 Kan. 110, Syl. ¶¶ 1, 3, 298 P.3d 344 (2013); *State v. Jones*, 293 Kan. 757, 760, 268 P.3d 491 (2012); see *State v. Gilliland*, 294 Kan. 519, 551, 276 P.3d 165 (2012); *Jolly*, 291 Kan. at 846-47. The court's analytical path for the departure must be clear. If the court ignores the requirements of either step, the result is an illegal sentence. *Jones*, 293 Kan. at 760.

At Castillo-Calles' sentencing hearing, the district court determined that his criminal history score was H. Aggravated indecent liberties with a child, without the age disparity that triggers Jessica's Law, is a severity level 3 person felony. K.S.A. 2017 Supp. 21-5506(c)(2)(C). The applicable guidelines sentence for a 3-H crime was 61, 66, or 71 months in prison. See K.S.A. 2017 Supp. 21-6804.

The district judge held there were substantial and compelling reasons to depart from the hard 25 sentence under Jessica's Law. However, rather than departing to the guidelines sentence for a 3-H offense, he imposed a 120-month sentence, stating:

> "[H]ere's what the Court will find, is that there ought to be—I think 25 years is too much, but I'm taking into consideration the victim's family in this case and the fact that the defendant—well, the evidence in this case, this was DNA evidence where the swab was on the child's skin and the defendant's DNA was on the child's skin, and so however the defendant wants to portray this as being a weak case, if he thinks that's what it is, this was a solid case, and the jury found that it was proved beyond a reasonable doubt, and so with regard to any claims, you know, that the victim told a different story, she's 12 years old and she's got an adult fondling her buttocks and trying to lick her breasts, so I don't have any problem believing that something happened with regard to this victim.
> "So here's what I'm going to do: . . . I'm going to find there is a substantial and compelling reason to depart from the 25-year sentence, but I'm going to give [Castillo-Calles] a ten-year sentence, so I'm going to assess 120 months which is a ten-year sentence with the Secretary of Corrections.

"I'm going to find that there are reasons to depart from the Jessica's Law sentence because this was a one-time offense. It was a one-evening circumstance. The defendant does not have any prior conduct that would indicate that this—that he is a pedophile and we don't know, but he's been working here in this area, and, frankly, if something like this would have happened over the last few years, I'm sure that law enforcement would have been called about it.

"I'm going to depart based on the type of conduct and the degree of conduct that took place here. This was not a forcible sexual intercourse. This was not a forcible rape of any kind, but it was a nonconsensual situation where a child was touched and licked which is even more—this is why I am going beyond the grid amount because this was a situation that deserves I think more punishment than what the grid calls for under . . . a level 3-H sentence but less than the 25 years to life that the Jessica's Law statutory sentence would require.

"The defendant does have a minor prior record, and so the Court is going to impose the 120-month sentence as the sentence in this case."

Castillo-Calles does not challenge the district court's first departure from Jessica's Law to the presumptive guidelines sentence. Rather, he contends that the court imposed an illegal sentence because it granted a second upward departure from the guidelines sentence without citing substantial and compelling reasons.

When the district court imposes a departure sentence, this court applies a mixed standard of review. First, this court determines whether the district court's reasons justifying a departure are supported by substantial competent evidence in the record. Then, it determines as a matter of law whether the reasons constitute substantial and compelling reasons for departure. *State v. Blackmon*, 285 Kan. 719, 724, 176 P.3d 160 (2008). To be "substantial," the reason must be "real, not imagined, and of substance, not ephemeral." *State v. Brown*, 305 Kan. 674, 697, 387 P.3d 835 (2017). To be "compelling," the reason must be one "which forces the court, by the facts of the case, to abandon the status quo and to venture beyond the sentence that it would ordinarily impose." 305 Kan. at 697.

18

Castillo-Calles argues that the only reason for the upward departure cited by the court—that this is a "nonconsensual situation where a child was touched and licked which is even more"—is not substantial and compelling because it simply states the elements of the crime. Aggravated indecent liberties with a child is defined as "[a]ny lewd fondling or touching" of a child younger than 14 years of age "done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both." K.S.A. 2017 Supp. 21-5506(b)(3)(A). Merely citing the facts that made the act illegal does not "'[force] the court . . . to abandon the status quo and . . . venture beyond the sentence that it would ordinarily impose.'" *Brown*, 305 Kan. at 697.

The State contends that the district court's reference to the "nonconsensual" nature of the act should be considered an aggravating factor. But the act of touching a child under the age of 14 years is itself the violation of the law; sexual touching of a child under the age of 14 is by law nonconsensual. See K.S.A. 2017 Supp. 21-5506; *State v. Haney*, 34 Kan. App. 2d 232, 241, 116 P.3d 747 (2005) ("[W]ith respect to children under the age of 14, society presumes the child cannot exercise any judgment regarding consent to sexual activity."). Accordingly, the victim's lack of consent alone does not compel an upward departure because it does not separate the facts of this case from an ordinary case involving the same crime and therefore does not force the court to abandon the ordinary sentence for the crime. See *Brown*, 305 Kan. at 697.

The court also cited the fact that Castillo-Calles had a "minor prior record." But a defendant's criminal history cannot be used to justify a departure sentence because the sentencing guidelines have already taken criminal history into account in determining the presumptive guidelines sentence. *State v. Thomas*, 40 Kan. App. 2d 1082, 1087, 198 P.3d 203 (2009).

The State contends that the district judge, in stating: "I'm taking into consideration the victim's family in this case," meant that I.W.'s emotional injury was in excess of that

19

normally associated with the crime and thus was an aggravating factor. But because the district court did not articulate a concern other than referring to "the victim's family," this court is left guessing as to the context in which the district court considered it. The sentencing court is required to state on the record the substantial and compelling reasons for departure. K.S.A. 2017 Supp. 21-6815(a). This court may consider only those factors articulated by the sentencing court. *State v. Bolden*, 35 Kan. App. 2d 576, 577, 132 P.3d 981 (2006). "'An appellate court reviewing a sentencing court's reasons for departure will not conduct a broader search of the record to examine all facts available to the sentencing court to determine whether there were substantial and compelling reasons for departure.'" *Blackmon*, 285 Kan. at 729. Consequently, without more, the court's reference to the victim's family is not a substantial and compelling reason to justify a departure sentence.

The State also notes that the sentencing court discussed the strength of the evidence against Castillo-Calles, which the State "believes . . . was taking into account Defendant's failure to take responsibility for his actions." It is the State's position that because a defendant's *acceptance* of responsibility may be a *mitigating* factor in support of a departure sentence, the *failure to take responsibility* should be an *aggravating* factor for upward departure. But the State again reads too much into the district court's statement; this court may not consider factors not specifically articulated by the district court. See *Blackmon*, 285 Kan. at 729.

> "[T]he possibility that a sentencing court could have relied on departure factors other than those stated on the record at the time of sentencing does not provide an appellate court the basis to uphold the sentence even if the record establishes there were substantial and compelling reasons for departure that were not noted by the sentencing court." 285 Kan. at 729.

The district court did not cite any substantial or compelling reasons to impose an upward departure from the guidelines sentence. See K.S.A. 2017 Supp. 21-6815(a). Accordingly, this court must vacate Castillo-Calles' sentence and remand for

resentencing. When a Jessica's Law sentence is vacated and a remand ordered for resentencing, the district court may reevaluate the factors bearing on sentencing, and regrant or deny a departure from Jessica's Law and a further departure from the default guidelines sentence. See *State v. Spencer*, 291 Kan. 796, 819, 248 P.3d 256 (2011).

Affirmed in part, reversed in part, and remanded for resentencing.