No. 101,346

STATE OF KANSAS, *Appellee*, v. PHOUTHAVY CHANTHASENG, *Appellant*.

(261 P.3d 889)

Opinion filed September 9, 2011.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Phouthavy Chanthaseng appeals his conviction for aggravated indecent liberties with a child. He argues that testimony regarding statements made by a fellow inmate at the Sedgwick County Jail should have been admitted, that the prosecutor committed reversible misconduct by arguing facts not in evidence and commenting on the credibility of the victim, and that the district judge erred by sentencing Chanthaseng without requiring the jury to find beyond a reasonable doubt that he was 18 years old or older when he committed the crime.

### FACTUAL AND PROCEDURAL BACKGROUND

Chanthaseng's accuser was M.C.T., his wife's 12-year-old niece. M.C.T. testified that, while she was spending the night at Chanthaseng's house in Wichita, she went into the living room to ask Chanthaseng for help with her laptop. While she was sitting in the living room, she said, Chanthaseng touched her breast and vagina and then gave her $32 in cash. Chanthaseng also led her into a hallway off of the living room, where he pulled down her pants and touched his exposed penis to the inside of her thigh.

Chanthaseng testified that M.C.T. had stayed at his house but that he had not molested her. Instead, after he tried unsuccessfully to help M.C.T. with accessing the Internet from her laptop, M.C.T. went to bed.

Before trial, M.C.T. had not told her full story in one sitting. Roughly 2 weeks after the incident, while at church, M.C.T. told her cousin about the living room touching, but she did not reveal the hallway touching. A week or two later, again at church, M.C.T. told her cousin about the hallway touching. After the cousin reported M.C.T.'s story to police, M.C.T. was interviewed three times by law enforcement, but she did not say anything about Chanthaseng giving her money until the week before trial.

Chanthaseng's wife, stepdaughter, and two sons also were at home the night that M.C.T. alleged the molestation occurred. Chanthaseng's wife and his infant son were asleep. Chanthaseng's stepdaughter testified that she had seen Chanthaseng helping M.C.T. with her computer in the living room, but she could not

account for the entire period before M.C.T went to bed. The only potential witness to the crime other than the participants was Chanthaseng's 4-year-old son, who was in the living room with his father. The police did not interview the boy, and the State did not call him as a witness at trial.

One of Chanthaseng's trial defenses was that M.C.T.'s cousin and the cousin's boyfriend, My T. Nguyen, convinced M.C.T. to make false allegations so that the couple could extort money from Chanthaseng. The defense sought to support this theory by putting on evidence of statements Nguyen made to Chanthaseng while the two were both in the Sedgwick County Jail. Chanthaseng testified that Nguyen expended considerable effort to seek him out, asking around for a man of Asian descent, and eventually following Chanthaseng by moving from table to table in a common area. According to the defense's proffer, Nguyen told Chanthaseng that the cousin "put them up to this" and that Nguyen could "help" Chanthaseng "make this go away" if Chanthaseng sent $10,000 to the cousin and $1,000 to "the girl." Nguyen then spelled the cousin's last name for Chanthaseng and provided her address. The defense attempted to elicit testimony about these statements through Chanthaseng and Michael Martin, a third jail inmate who overheard the conversation; but the district judge excluded the testimony as hearsay. Nguyen was present at trial; however, because he invoked his Fifth Amendment privilege not to testify, the district judge declared him unavailable and ruled that any testimony about his statements was inadmissible.

Despite these rulings, Chanthaseng was able to present some evidence about the substance of the conversation between himself and Nguyen. He testified that he had asked Nguyen whether sending $11,000 to the cousin would ensure that M.C.T.'s allegations were recanted, and Nguyen had confirmed this. Defense counsel also was permitted to argue this defense theory to the jury.

During voir dire, the prosecutor asked potential jurors about their history of physical or sexual abuse, referencing a "process of disclosure" and feelings of shame experienced by disclosing victims. She asked venire members if they understood "why it might take a while for a child to disclose." Nine venire members said they

had some experience with such abuse, either personally or from knowing someone who had been abused. Of these, three talked about victims not reporting instances of sexual abuse until several years later. One of the three, who had been a victim, ultimately served as a juror.

During opening statement, the prosecutor said: "Disclosure for this child has been a process, not an event." She then restated the proposition more generally: "Disclosure is a process, not an event."

During closing argument, the prosecutor said:

"What do you think? What—what have you seen about the secrecy, the helplessness, the entrapment [that] goes [with] these kinds of cases? Do you think this is just an additional detail that, of course, has come out in the ordinary passage of time about how a kid processes this stuff? . . . We talked about, during voir dire, how disclosure of sexual abuse or even physical abuse of kids, and you heard some of your fellow jurors during jury selection, yeah, disclosure is a process, not an event."

The prosecutor also mentioned M.C.T.'s credibility five times during her closing argument:

(1) "Yes. The evidence shows that *she is a credible witness*. Well, why didn't you tell your father, by the way? I thought he would be mad. She was afraid to tell her dad, because she got his permission to spend the night at his—at that house. Yes. She was afraid to tell her father." (Emphasis added.)

(2) "Yes. *She is credible*, because look at the evidence. Compare, you know, what was the purpose of the State showing to you the DVD, so you could see her on October 1st, and the audio of what she was like on October 18th. And the—and the DVD of what she was like on—n May 24th of this year. What was the purpose of that, so that you could judge her yourselves, whether she has changed or whether she is funky or whether she is different. Don't you find that her manner, her candor, her demeanor was consistent throughout each time she was asked about all this stuff." (Emphasis added.)

(3) "And then, of course, you had the opportunity to see her live in court, live, up close and personal. Yes, *she is credible*. She is consistent. She is the same on the elements." (Emphasis added.)

(4) "*She's credible*. You can see where she points to on the body diagrams. If you—watch the DVD again, if you need to. And there is dead time where nobody is in the room where you have the opportunity to observe what she's like." (Emphasis added.)

(5) "But I will point out to you this, her sort of social circumstances, the quality of what her personal—her personality is like *makes her more credible* in terms of

how you evaluate the evidence, not less. She is less susceptible of sustained ma-
nipulation the defense tries to hint at in this case." (Emphasis added.)

Regarding Chanthaseng's age, M.C.T. testified that the crime
occurred on August 31, 2007. The caption of the complaint showed
Chanthaseng's birth year as 1970, and he testified that he was 38
years old at the time of trial and had been born in 1970. The district
judge's instructions to the jury did not include the defendant's age
of 18 or over at the time of the crime as an element of the offense.
At sentencing, the district court stated that Chanthaseng was 37
years old when the crime was committed, and he sentenced Chan-
thaseng to life under Jessica's Law, K.S.A. 21-4643. This sentence
was available only if the crime was classified as off-grid because
defendant was 18 years old or older and the victim was younger
than 14 at the time it was committed. See K.S.A. 21-4643(a)(1)(C).

## DISCUSSION

*Testimony About Nguyen's Statements*

On appeal, Chanthaseng argues that the trial court erred by ex-
cluding his and Martin's testimony about Nguyen's statements. He
argues that he did not offer the statements for the truth of the
matters asserted and they were thus admissible nonhearsay. He
also asserts that the statements were admissible under K.S.A. 60-
460(j) as statements against Nguyen's interest.

Neither of these arguments was advanced in the district court.
Indeed, Chanthaseng passed up several opportunities at confer-
ences with the judge out of the hearing of the jury. The party
arguing for admission of evidence should provide a district judge
with a specific objection or argument on an issue so that he or she
has a chance to consider, as fully as possible, whether the evidence
should come in and to avoid any potential reversible error. *State
v. Brown*, 291 Kan. 646, 652, 244 P.3d 267 (2011) (quoting *State
v. Richmond*, 289 Kan. 419, 429, 212 P.3d 165 [2009]).

Chanthaseng contends that we should nevertheless consider his
claim, arguing that appellate courts may address the merits of con-
stitutional issues raised for the first time on appeal if the issue falls
within one of three recognized exceptions: (1) The newly asserted
claim involves only a question of law arising on provided or ad-

mitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason. *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010) (citing *State v. Spotts*, 288 Kan. 650, 652, 206 P.3d 510 [2009]). Recently, however, we have refused to review an evidentiary issue not preserved for appeal, even when the issue involved a fundamental right. *Dukes*, 290 Kan. at 488.

We hold that none of the exceptions is applicable to save Chanthaseng's claim here. On the first exception, although there is a purely legal question on hearsay, its resolution will not be determinative of the case. See *Richmond*, 289 Kan. at 429 (admissibility of testimony not determinative; case still subject to review of all other evidence under state standard, federal standard, both). On the second exception, exclusion of the evidence in question did not implicate Chanthaseng's fundamental rights; the substance of his conversation with Nguyen still got before the jury. See *State v. Baker*, 281 Kan. 997, 1009, 135 P.3d 1098 (2006) (defendant's right to jury trial not violated when other evidence to support defense theory presented); *State v. Carr*, 265 Kan. 608, 621-22, 963 P.2d 421 (1998) (same), *abrogated on other grounds State v. Anthony*, 282 Kan. 201, 145 P.3d 1 (2006). The third exception applies when a party seeks to uphold a district judge's decision, not when the party attacks it.

For all of the reasons above, we do not reach the merits of Chanthaseng's first issue on this appeal. See *State v. Haislip*, 237 Kan. 461, Syl. ¶ 5, 701 P.2d 909 (1985).

*Prosecutorial Misconduct*

We analyze Chanthaseng's allegations of prosecutorial misconduct in two steps.

" 'First, the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal.' " *State v. Richmond*, 289 Kan. at 439 (quoting *State v. White*, 284 Kan. 333, Syl. ¶ 1, 161 P.3d 208 [2007]).

See *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004).

Chanthaseng argues that the prosecutor committed misconduct during her opening statement and closing argument by arguing facts not in evidence and commenting on the credibility of the victim. He made no trial objections to the prosecutor's comments, but a contemporaneous objection to prosecutorial misconduct during opening statement or closing argument is not required to preserve the issue for appeal. *State v. Stone*, 291 Kan. 13, 17, 237 P.3d 1229 (2010) (citing *State v. McReynolds*, 288 Kan. 318, 322-23, 202 P.3d 658 [2009]); *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) (prosecutor's statements during voir dire, opening statement, closing argument reviewed in absence of objection).

Chanthaseng's first argument springs from the way in which the prosecutor dealt with M.C.T.'s gradual revelations over the course of several conversations with her cousin and several interviews with law enforcement. As set forth above, the prosecutor began addressing this disclosure pattern at the earliest stages of trial—first in voir dire, then in opening statement. She returned to her assertion that such a disclosure pattern is typical of child sexual abuse victims during closing argument, referencing personal experiences disclosed by venire panel members during voir dire.

The State argues that, when viewed in context, the prosecutor's statements qualified as fair comment on the evidence. In particular, the State posits that it was permissible for the prosecutor to reference prospective jurors' consistent stories because she was allowed to urge jurors to employ common knowledge and experience in deciding the case.

In opening, insofar as the prosecutor was only summarizing what she believed the evidence would show—that in M.C.T.'s case disclosure was a process, not an event—we see no error. The first general reference to children's staggered disclosure came on the heels of the more specific statement, "Disclosure for *this* child has been a process, not an event."

But we cannot be so sanguine about the prosecutor's closing argument references to venire panel members' experiences with delayed or piecemeal disclosure of child sexual abuse. There simply was no evidence before the jury to show that such disclosure is

typical or emblematic or indicative of trustworthiness, inferences the prosecutor obviously hoped the jury would draw from M.C.T.'s testimony. Contrary to the State's argument, this was not equivalent to asking jurors to consider common human experience in discharging their duty; rather it was cynical manipulation toward a pseudo-scientific conclusion from limited, subjectively reported anecdotes of their peers.

The prosecutor's behavior on this point is analogous to a State tactic we held to be misconduct in our recent case of *State v. Simmons*, 292 Kan. 406, 254 P.3d 97 (2011).

In *Simmons*, a rape and kidnapping prosecution, the prosecutor made reference during voir dire to Stockholm Syndrome and secured at least one venire panel member's agreement that the syndrome may exist when a kidnapping victim begins to empathize with his or her kidnapper, a la Patty Hearst. The prosecutor asked potential jurors to view the evidence they were about to hear—including testimony that the victim rubbed the alleged kidnapper's back and called him "baby"—through the lens of Stockholm Syndrome, even though the State sponsored no expert evidence about the syndrome in general or about the victim suffering from it. Under these circumstances, we agreed with the defense that the prosecutor committed misconduct by arguing facts not in evidence. *Simmons*, 292 Kan. at 414-15 (citing Kansas Rule of Professional Conduct 3.4[e]; *State v. McCaslin*, 291 Kan. 697, 717, 245 P.3d 1030 [2011]). We quoted from *State v. Huerta-Alvarez*, 291 Kan. 247, 243 P.3d 326 (2010), on the danger that the practice would circumvent the rules of evidence because of jurors' tendency to overvalue what is effectively unsworn testimony by a highly regarded prosecutor, despite the information's worthlessness as a matter of law. *Huerta-Alvarez*, 291 Kan. at 263 (citing *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 [2000]; *State v. Morris*, 40 Kan. App. 2d 769, 791-92, 196 P.3d 422 [2008]; and quoting *People v. Hill*, 17 Cal. 4th 800, 828, 72 Cal. Rptr. 2d 656, 952 P.2d 673 [1998]).

In short, Chanthaseng's first prosecutorial misconduct argument has merit. There was error. See *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009) (when prosecutor argues facts not in evidence,

first prong of prosecutorial misconduct test met); *State v. Ly*, 277 Kan. 386, Syl. ¶ 4, 85 P.3d 1200 (2004), *cert. denied* 541 U.S. 1090 (2004) (same).

The prosecutor's five references to M.C.T.'s credibility trouble us less. Each was accompanied by a discussion of the evidence presented at trial, and this all-important context persuades us that the prosecutor was merely asking the jury to draw permissible inferences from that evidence. A prosecutor may offer the jury an explanation of " 'what it should look for in assessing witness credibility.' " *State v. McReynolds*, 288 Kan. 318, 326, 202 P.3d 658 (2009) (quoting *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 [2008]). There is a distinction between such proper argument and its improper twin, argument on the prosecutor's personal belief or opinion about a witness' credibility. See *State v. Finley*, 273 Kan. 237, 245-46, 42 P.3d 723 (2002).

We now turn to the second, plain-error prong of our prosecutorial misconduct analysis. We are required to consider three factors:

" '(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial), have been met.' " *State v. Richmond*, 289 Kan. 419, 440, 212 P.3d 165 (2009) (quoting *State v. Bryant*, 285 Kan. 970, Syl. ¶ 2, 179 P.3d 1122 [2008]).

See also *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004) (second step essentially directed to whether misconduct so prejudicial that it denied fair trial).

In assessing whether gross and flagrant conduct has occurred, appellate courts should look to whether the prosecutor " 'repeated or emphasized the misconduct.' " *State v. Simmons*, 292 Kan. 406, 417-18, 254 P.3d 97 (2011) (quoting *State v. Madkins*, 42 Kan. App. 2d 955, 961, 219 P.3d 831 [2009]). Similarly, a prosecutor's ill will is usually "reflected through deliberate and repeated mis-

conduct or indifference to a court's rulings." *Madkins*, 42 Kan. App. 2d at 961 (citing *State v. Bunyard*, 281 Kan. 392, 407, 133 P.3d 14 [2006]).

In this case, the prosecutor's use of the "process of disclosure" theme was, as themes tend to be, recurrent. But it was nevertheless one error, not several. The prosecutor did not persist in committing it after admonition, as there was no admonition. In addition, we observe that this case was tried well before our *Simmons* opinion was filed. *Simmons* is the clearest guidance this court has issued on the peril prosecutors pose for convictions when they use the tactic employed here. Under these circumstances, we conclude that the prosecutor's conduct was neither gross and flagrant nor illustrative of ill will, the first two factors under the second prong of our prosecutorial misconduct analysis.

Turning to the third factor, whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors—we note first that Justice Marla J. Luckert's recent opinion in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), is pertinent. *Ward* synthesized our caselaw on harmless error, whether judged under the state standards set out in K.S.A. 60-261 and 60-2105 or under the federal standard of *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Ward*, 292 Kan. at 569-70. Until *Ward*, the second prong of our prosecutorial misconduct analysis required any error to be harmless under both the state and federal standards. See *Tosh*, 278 Kan. at 96-97. Since *Ward* was decided, at least two cases have recognized that it effectively collapsed the two into the one federal standard, see *State v. Naputi*, 293 Kan. 55, 58, 260 P.3d 86 (2011); *State v. Hall*, 292 Kan. 841, 855, 257 P.3d 272 (2011). To meet the federal standard, the State, as the party who has benefitted from the prosecutorial misconduct, bears the burden to show that there is no reasonable possibility that the error affected Chanthaseng's substantial rights, *i.e.*, that there is no reasonable possibility the error affected the verdict. *Ward*, 292 Kan. 541, Syl. ¶ 6.

Although *Simmons* was decided before *Ward*, it is instructive on the third factor of the second prong of our prosecutorial misconduct analysis.

In *Simmons*, we ultimately ruled that the defendants' convictions must be reversed because of the Stockholm Syndrome prosecutorial misconduct discussed above. We were influenced by the jury's mixed verdict—conviction on two rape counts, acquittal on aggravated criminal and aggravated kidnapping counts, and hung on a third rape count. We also were influenced by the prosecutor's explicit request that jurors use the syndrome "as their lens when they examined certain evidence." 292 Kan. at 412. We noted:

"[T]he prosecutor essentially argued that despite inferences that could be drawn by the jury panel from certain evidence, [the victim's] participation in the sex acts forming the basis for four of the charged crimes was not voluntary. As in the charged crime of aggravated kidnapping, the factor of voluntariness, *i.e.*, consent, also was an absolute defense to the sex crimes. The State needed to negate this defense for Simmons' convictions. [Citations omitted.]

"Additionally, the jury was never told to disregard the prosecutor's discussion of the Stockholm Syndrome. Nor was it told to disregard his implication that the syndrome explained that [the victim] psychologically identified with her captor and therefore could never truly give consent. . . . Simmons . . . relies upon his acquittals of aggravated kidnapping and aggravated criminal sodomy to argue: 'The jury must have thus believed that A.H. *willingly* spent *some* of the weekend with Mr. Simmons.' (Emphasis added.) Given the mixed results of the verdicts, we will not speculate as to the exact effect the State's comments had on the jury during its deliberations on all charges. But we can conclude that the prosecutor's argument that [the victim] was not a voluntary participant because of the Stockholm Syndrome could easily have affected important parts of the trial." *Simmons*, 292 Kan. at 421-22.

The prosecutor in this case flew far too near to the sun. The next prosecutor to do so is highly likely to be burned. Nevertheless, because this prosecutor stopped short of explicitly encouraging the jury to view the evidence before it through the "lens" of her nonexpert theory about the "process of disclosure" and because we do not have the evidence of factfinder ambivalence we had in *Simmons*, we hold that the prosecutorial misconduct here is not "plain" and thus not reversible.

*Defendant's Age*

Chanthaseng's last argument is that he cannot be sentenced for off-grid aggravated indecent liberties without an instruction telling the jury it must find beyond a reasonable doubt that he was 18

years old or older at the time of the crime. This issue has been evergreen since the passage of Jessica's Law, K.S.A. 21-4643. See *State v. Brown*, 291 Kan. 646, 244 P.3d 267 (2010); *State v. Kemble*, 291 Kan. 109, 129, 238 P.3d 251 (2010); *State v. Garza*, 290 Kan. 1021, 1031-32, 236 P.3d 501 (2010); *State v. Martinez*, 290 Kan. 992, 1019, 236 P.3d 481 (2010); *State v. Colston*, 290 Kan. 952, 235 P.3d 1234 (2010); *State v. Reyna*, 290 Kan. 666, 234 P.3d 761 (2010); *State v. Morningstar*, 289 Kan. 488, 213 P.3d 1045 (2009); *State v. Gonzales*, 289 Kan. 351, 212 P.3d 215 (2009); *State v. Bello*, 289 Kan. 191, 211 P.3d 129 (2009).

Chanthaseng did not challenge the district judge's elements instruction before he took this appeal; he therefore must show that the omission of an instruction on his age was clearly erroneous. *State v. Bailey*, 292 Kan. 449, 455, 255 P.3d 19 (2011). Chanthaseng's argument that this failure to instruct was clear error relies upon statutory and constitutional interpretation; therefore, this court's review is unlimited. *Bello*, 289 Kan. at 195-96 (citing *State v. Allen*, 283 Kan. 372, 374, 153 P.3d 488 [2007]); *State v. Bryan*, 281 Kan. 157, 159, 130 P.3d 85 (2006).

Chanthaseng is right on the substance but wrong on the remedy.

Based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), his age at the time of the offense is an essential element of the crime. *Gonzales*, 289 Kan. at 371; *Bello*, 289 Kan. at 199-200. And, in *Morningstar, Gonzalez,* and *Bello*, this court determined that this instruction error required us to vacate the defendant's off-grid sentence and remand for resentencing under the correct grid box under Kansas Sentencing Guidelines Act. *Morningstar*, 289 Kan. at 495; *Gonzales*, 289 Kan. at 371; *Bello*, 289 Kan. at 200.

In *Reyna*, however, a majority of this court held: "When a reviewing court concludes beyond a reasonable doubt that the omitted element . . . was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Reyna*, 290 Kan. 666, Syl. ¶ 10; see *Kemble*, 291 Kan. at 129; *Garza*, 290 Kan. at 1031-32; *Martinez*, 290 Kan. at 1019; *Colston*, 290 Kan. at 975-76.

Chanthaseng's own uncontested testimony about his age means the absence of the instruction does not require resentencing. The situation is "such that the jury verdict would have been the same absent the error."

## CONCLUSION

In view of all of the foregoing discussion, defendant Phouthavy Chanthaseng has not demonstrated that he is entitled to reversal of his conviction or to resentencing. The judgment of the district court is affirmed.

BUSER, J., assigned.