NOT DESIGNATED FOR PUBLICATION

No. 126,712

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JUSTIN THOMAS LEE INGRAM,
*Appellant*.


MEMORANDUM OPINION

Appeal from Saline District Court; RENE YOUNG, judge. Oral argument held May 20, 2025.
Opinion filed May 8, 2026. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, *Kristafer R. Ailslieger*, deputy solicitor general, and
*Kris W. Kobach*, attorney general, for appellee.


Before HILL, P.J., ISHERWOOD and PICKERING, JJ.


ISHERWOOD, J.: A jury convicted Justin Thomas Lee Ingram of rape, aggravated
criminal sodomy, and battery for acts perpetrated against an eight-year-old girl. What
may or may not be a "typical" evidentiary landscape in prosecutions for child sex
offenses is a matter that must be introduced into evidence through the testimony of a
witness whose professional background has vested them with a particular degree of
knowledge regarding that issue. The State may not simply inform the jury what is
"typical" based on their own prosecutorial experience, lest they run afoul of the
prohibition on discussing facts not in evidence. The prosecutor for Ingram's trial failed to

1

honor that obligation and error occurred as a result. We disagree with Ingram's contention that the error entitles him to a new trial and instead conclude that it ultimately did not have an impact on the jury's verdict. Ingram also requested review of the denial of his request for a departure sentence. But the justification he offers on appeal in support of that reduced term differs from what he argued to the district court, and he has not established an exception that allows us to analyze the claim. Accordingly, we decline to engage in an analysis of the merits of Ingram's sentencing claim. The defendant's convictions are affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

In December 2019, "Jane" disclosed to her father that Ingram had sexually abused her. But her father did not believe Jane shared enough credible information "to really warrant, you know, alarm five response because of the way the story had to be manufactured."

Jane then turned to a different relative and said that Ingram "hurt [her] really bad" when Jane's family lived in a trailer from October 2014 to the end of the school year in 2015. Jane would have been eight or nine years old during the specified period of time. When the relative inquired whether Ingram "put his penis in" her, Jane replied, "No, just his fingers." The relative reported Jane's allegation to the sheriff's office later that day.

Law enforcement officers contacted Ingram for an interview, and he agreed to speak with them. Ingram explained to the officers that he believed that Jane's relative and that relative's spouse were behind the allegations. He posited that the allegations might be related to the fact that the biological mother of all three of her girls was scheduled to be released from prison soon. The State ultimately charged Ingram with one count each of rape, aggravated criminal sodomy, and battery, all alleged to have occurred between

September 2014 and May 2015. Ingram's first two trials ended in mistrials after the jury was unable to reach a verdict on each charge before it.

In 2023, Ingram stood trial for a third time, on the same charges, and that is the proceeding we have before us for consideration. The State presented the testimony of 11 different witnesses, including Jane, the relative to whom Jane disclosed what happened to her, as well as Jane's siblings ("Susie" and "Beth") and her biological father. The jury also had the opportunity to watch recorded videos of the individual interviews that law enforcement officers conducted with each of those individuals, minus the relative Jane opened up to. The State also introduced evidence, pursuant to K.S.A. 60-455, of Ingram's 1999 no-contest plea in Dickinson County for attempted aggravated indecent liberties with a child. That conviction stemmed from Ingram's relationship with a 12-year-old girl when he was 17 years old. That now much older woman was called to testify about their past relationship and maintained that it was "consensual."

Jane informed the jury that Ingram called her into his bedroom at the trailer and pushed her onto the bed. He then pulled down her jeans and underwear, licked her vagina and then touched it with his fingers. Jane testified that she screamed during this incident, which prompted Ingram to "slap[]" her and order her "to shut up." The incident stopped when she "[p]ushed" Ingram and ran outside, where her siblings were playing. Jane did not identify the exact day or month when the incident occurred but recalled that it was warm outside. During cross-examination, Jane added the detail that she was able to escape the incident by kicking Ingram in the face. She previously testified that she kicked Ingram but did not specify where the blow landed. Jane's testimony was consistent with the account she provided during her forensic interview.

Jane's relative testified about the child's disclosure and the report made to the sheriff's office. That relative also offered details regarding a discussion shared with Jane's father prior to the disclosure in which her father expressed concerns about Jane cutting

herself. Jane's father was called to testify and described his reaction to Jane's disclosure to the relative. He also acknowledged that he was Jane's initial confidant "a few months" before his discussion with the relative about Jane's cutting behaviors and before Jane disclosed Ingram's conduct to that relative, but that he chose not to report it to authorities.

Susie and Beth independently described the day when they were playing together outside while Jane was inside the trailer with Ingram. Both girls recounted how Jane emerged from the trailer crying but refused to provide an explanation. Several years later, Jane confided in her sisters and shared that Ingram sexually abused her on the day they witnessed her crying. At that time, Jane secured promises from both that they would preserve her secret.

Jane's father also testified. Despite testifying at the first trial that he did not believe Jane's accusations and continuing to express skepticism during his testimony at the second trial, Jane's father testified at this third trial that he believed her. He explained that his difficulty with Jane's statements was that he feared he might have led her to make the statements by the content of his questions and the manner in which they were posed. In short, he was concerned that she was suggestible, and that the phrasing of his questions might have led her to certain answers. Nevertheless, he believed her allegations.

The jury convicted Ingram on all three counts. Before sentencing, Ingram filed a motion for dispositional or durational departure, citing several mitigating factors. At sentencing, Ingram asked the court to, "at a minimum," depart down to the sentencing grid. The district court declined to find that Ingram's case presented substantial and compelling reasons to warrant granting his request for a sentencing departure. The court sentenced Ingram to life in prison without the possibility of parole for 25 years for counts I and II (rape and aggravated criminal sodomy) and six months in jail for count III (battery), with all sentences served concurrently.

Ingram now brings his case before this court with the request that we analyze whether he received the fair trial he is entitled to and whether the district court properly exercised its discretion when it refused to depart and sentence Ingram to serve a lower prison term. Additional facts will be discussed as necessary to conduct a thorough analysis of the issue raised for our review.

LEGAL ANALYSIS

*Did the State commit reversible prosecutorial error by telling the jury, on more than one occasion, that a lack of physical evidence, the lack of eyewitnesses, and delayed disclosures were typical for child sex offense cases?*

On appeal, Ingram claims the State committed prosecutorial error during voir dire and closing argument by telling the jury that child sex crime prosecutions typically lack certain types of evidence and involve victims who were hesitant to reveal the acts inflicted upon them. The State argues that the challenged statements were allowable because their content was a matter of common sense and any error attributable to the comments was cured by the district court's ameliorating jury instruction and did not result in prejudice to Ingram.

Ingram did not object to any of the statements that he now takes issue with. Even so, appellate courts will review a prosecutorial error claim based on comments made during voir dire, opening statement, or closing argument even without a timely objection. But we are still free to consider the presence or absence of an objection into our analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

Appellate courts use a two-step process when examining allegations of prosecutorial error. At the first step, we "analyze whether the prosecutor's acts fell outside the wide latitude afforded prosecutors." *State v. Sean*, 306 Kan. 963, 973, 399 P.3d 168 (2017). If error is identified, the second step of the analysis is triggered, and we must

5

discern whether that error resulted in prejudice to the defendant's right to a fair trial. 306 Kan. at 973. That assessment is conducted by employing the constitutional harmless error test to determine whether the State has proven "'beyond a reasonable doubt that . . . there is no reasonable possibility that the error contributed to the verdict.'" 306 Kan. at 973-74; see *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmlessness test. *State v. Sherman*, 305 Kan. 88, 114, 378 P.3d 1060 (2016).

*Salient Facts to This Issue*

During jury selection, the State inquired whether the prospective jurors believed the State possessed the "same capabilities" as crime shows where "they seem to always figure it out based on DNA or, you know, somebody left a hair here, or something." The State then told the pool that "in the vast majority of child sex cases, there [are] no eyewitnesses. . . . [I]t makes sense, right? . . . [N]obody commits sex crimes with kids in front of others. So you can eliminate the eyewitnesses, which eliminates a lot of stuff you see on TV about crimes."

The State also addressed the issue of delayed reporting in child sex cases:

"The other thing that's very common with sex crimes involving children is children don't usually report the same day . . . . Children often have delayed reporting. Sometimes days, sometimes weeks, sometimes months, sometimes years. So what that means is no physical evidence. And so what you rely on in these kinds of cases is who the child told at the time, other kinds of . . . I guess you would call hard evidence, because testimony, the accounts from people the child knew, those are all things that constitute evidence. It may not be a hair. It may not be DNA. But it's evidence."

The State then questioned whether anyone thought they "could never find anybody guilty of any crime unless there was an eyewitness or some kind of hard physical evidence[.]" Ingram did not object to any of these statements.

The State returned to its theme of—the typical evidence in child sex offense cases—during closing argument:

"[A]nd as I told you when we were doing jury selection yesterday morning, this is a typical child sex crime. People don't typically commit child sex crimes in front of witnesses. And so there are no witnesses. Children typically do not report immediately, so that eliminates any physical defense; DNA, fingerprints, the things that we look for in physical evidence. So that leaves you with judging the credibility of all the witnesses you've heard for both sides . . . and deciding . . . who you believe and who you do not."

Ingram's counsel again did not object to these statements, but during her opportunity for closing argument, she attempted to undermine Jane's testimony and highlighted inconsistencies in her father's testimony. Defense counsel also reminded the jury that Jane's mother was due to be released from prison around the same time Jane accused Ingram of these acts and suggested that the mother's inducement for Jane to make such claims "would be one way to get her child back."

During rebuttal, the State repeated its assertions as to what is considered "typical" evidence in child sex offense cases: "I'd love to give you some DNA. I'd love to give you an eyewitness. But this is the typical child molestation case. No eyewitnesses. No physical evidence. What it comes down to is, [d]o you believe [Jane] and her sisters?" Ingram's counsel was, again, unmoved by these statements.

Ingram contends that when the State "assured the jury that the lack of any forensic and/or physical evidence was no big deal" during both voir dire and closing arguments, it amounted to prosecutorial error of the magnitude that necessitates a new trial. He asserts

that it was improper for the State to essentially tell the jurors, without any evidence to tether such assurances to, that they could simply disregard the fact that Jane's reporting was delayed and be nonplussed by the lack of eyewitnesses or certain types of physical evidence because that was just the nature of child sex crime prosecutions.

The State acknowledges that it did not elicit evidence at trial that provided a foundation for the challenged statements. But it asserts that the challenged remarks simply "not[ed] the obvious fact that [eyewitnesses and physical] evidence was not required for a conviction." Thus, the prosecutor was merely "asking the jury to use its common sense and not require impossible evidence to convict Ingram." That is, in the State's view, it is common knowledge among the population as a whole, what the prosecution of child sex crimes entails. With our backdrop clarified, we filter the challenged statements through the two-part test set out earlier in this opinion.

*Whether the Comments Fell Outside the Wide Latitude Afforded to Prosecutors*

Our Supreme Court has outlined the limits for the remarks prosecutors can make concerning the evidence elicited at trial: "[A] prosecutor may draw reasonable inferences from the evidence but may not comment upon facts outside the evidence. . . . [W]hen a prosecutor argues facts not in evidence, the first prong of the prosecutorial [error] test is met. [Citations omitted.]" *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011).

One of the earliest cases to address the issue in the context of sex offenses committed against a child was *State v. Simmons*, 292 Kan. 406, 254 P.3d 97 (2011). During voir dire in that case the prosecutor made reference to Stockholm Syndrome and asked potential jurors to view the evidence they were about to hear through the lens of that condition, even though the State offered no expert evidence about the syndrome in general or anything tending to indicate the victim was afflicted with it. Under these circumstances, the Kansas Supreme Court found that the prosecutor impermissibly

argued facts not in evidence and, when combined with another instance of prosecutorial error in the case, required reversal of Simmons' convictions. 292 Kan. at 414-15, 423.

The State suggests the same outcome is not appropriate here because in Ingram's case the prosecutor was invoking the jury's common sense rather than arguing facts not in evidence and directs our attention to *State v. Henderson*, 32 Kan. App. 2d 1202, 96 P.3d 680 (2004), as a possible analog. There, during a trial for abuse of a child, the prosecutor claimed during closing argument that human babies were more vulnerable than baby animals and relied on their parents for protection. Henderson asserted these statements amounted to facts not in evidence. On appeal, the *Henderson* panel found the prosecutor's argument simply invoked the jury's common sense. It drew a distinction between the prosecutor's references to baby animals and "the improper suggestion to the jury that there are facts directly bearing on the case that the jury should know but for some reason were not brought out in the evidence." 32 Kan. App. 2d at 1210.

We believe what occurred in *Henderson* is distinguishable from the statements subject to scrutiny in Ingram's case. Rather than referring to a wholly unrelated topic as a rhetorical gesture, the prosecutor here commented on the type of evidence typically involved or absent in child sex offense cases and directed the jury how it should consider such evidence. By suggesting the lack of physical evidence and absence of eyewitnesses was normal for such cases, the prosecutor's statements were integral to the case, whereas the comments in *Henderson* are more aptly described as a picturesque analogy.

From our research, *State v. Chanthaseng*, 293 Kan. 140, 261 P.3d 889 (2011), offers more meaningful guidance than *Henderson*. In *Chanthaseng*, the prosecutor focused on a particular theme with the jury, that child victims of sex crimes frequently exhibit a pattern of gradual disclosure of the acts perpetrated against them. The State introduced the jury to that concept during voir dire. The issue was then reinforced during the prosecutor's opening statement and addressed for the final time during closing

9

arguments when the State informed the jury that such patterns are typical of child sexual abuse victims. 293 Kan. at 146.

On appeal, Chanthaseng challenged the prosecutor's theme of "'disclosure is a process not an event'" as erroneously airing facts not in evidence. 293 Kan. at 143. In analyzing the claim, the Kansas Supreme Court noted a distinction between the prosecutor's opening statements that focused specifically on the delayed disclosure of the child victimized by Chanthaseng, versus those made in closing argument that intimated the disclosure pattern is more global and "typical or emblematic or indicative of trustworthiness." 293 Kan. at 146-47.

The State argued, similarly to what it asserts here, that the statements were not erroneous because the prosecutor was permitted to "urge jurors to employ common knowledge and experience in deciding the case." 293 Kan. at 146. The court rejected that claim stating they were "not equivalent to asking jurors to consider common human experience in discharging their duty; rather it was cynical manipulation toward a pseudo-scientific conclusion from limited, subjectively reported anecdotes of their peers." 293 Kan. at 147. The error was ultimately found not to be reversible. 293 Kan. at 150.

Prosecutorial error in the form of "facts not in evidence" in a child sex crimes case was before the court for consideration again in *State v. Ninh*, 320 Kan. 477, 495, 570 P.3d 1169 (2025). In that instance, the prosecutor mentioned grooming during its rebuttal closing argument as a type of force rapists use to eventually overcome their victims. Specifically, the prosecutor asserted: "Some of them cause pain. Some rapists use alcohol so a victim doesn't know or is incapacitated and can't respond back. *His form of force was grooming*." 320 Kan. at 496.

Ninh appealed and characterized those statements as prosecutorial error. The State justified the assertion as merely an inference that was properly drawn from the

investigating detective's testimony. The court was not persuaded given that the detective testified to nothing more in that regard than the singular statement that he had encountered grooming behavior as one type of force used by perpetrators in sex cases. 320 Kan. at 497. That is, she did not explain the psychological underpinnings of grooming or how Ninh's behavior toward the victim fell within its parameters. The detective also did not illustrate for the jury how the victim's submission to nonconsensual acts demonstrated that she was overcome by the force that Ninh's grooming practices inflicted. The court noted the detective likely would not have offered testimony to that effect anyway because the State's theory throughout the case was that the victim was overcome by fear, not force. Accordingly, the challenged statements were not a legitimate reasonable inference drawn from the evidence. 320 Kan. at 497.

The court concluded that the prosecutor's statements were erroneous but declined to find that reversal was necessary because the remarks were very limited and there was sufficient evidence to support the State's theory that the victim was overcome by fear. Thus, there was no reasonable possibility the error contributed to the verdict. 320 Kan. at 497-98.

Finally, a panel of this court has also had an opportunity to weigh in on the issue. In *State v. McHenry*, No. 119,230, 2020 WL 2503484, at *12 (Kan. App. 2020) (unpublished opinion), the prosecutor took a similar tack as the cases set out above and delivered a closing argument in McHenry's trial for child sex offenses that informed the jury:

> "'*These cases* are tough because they generally involve somebody who doesn't want to be caught[,] [someone] [w]ho wants to do something that they can get away with and avoid detection. So you're not going to do something like this in the middle of the mall, where there might be a bunch of witnesses. . . . *These cases* generally involve someone who has more maturity, more expertise, or intellect. Taking advantage of somebody else . . . .' (Emphases added.)"

11

This court found that, in line with similar preceding cases, the prosecutor's argument constituted error. It reiterated that when the State referred to the circumstances of McHenry's case as "typical" for that type of offense, in the absence of any expert testimony to support such an assertion, it erroneously focused the jury's attention on facts that were not in evidence. 2020 WL 2503484, at *12. That is, the prosecutor failed to restrict their comments to the facts of the case at hand. But because the district court had instructed the jury to disregard any statements of counsel that were not supported by the evidence, the error fell short of being reversible. 2020 WL 2503484, at *12.

Thus, Kansas courts have previously and consistently found it to be an improper disclosure of facts not in evidence when prosecutors specifically comment on the type of evidence that is "typical" for cases of a particular nature when no evidence was offered at trial to substantiate such contentions. Ingram's trial took place in March 2023. While the prosecutor would not have had the benefit of the Supreme Court's ruling in *Ninh* to guide their trial preparations, they would have certainly had access to the stern admonitions the court issued in *Simmons* and *Chanthaseng* to clarify the requisite boundaries.

By way of refresher, what is at issue here are the State's assertions during voir dire and closing arguments that delayed disclosures, as well as an absence of forensic and eyewitness evidence, are "typical" in cases involving child sex crimes. The State candidly acknowledges that no evidence was introduced to validate these assertions but, again, maintains that it was neither necessary nor required because the content of the statements was within the jury's common knowledge and experience. As set out above, this particular lifeline was attempted and rejected in earlier cases, and we find it equally unavailing. The State does not favor us with an argument that justifies giving a nod here to statements that reviewing courts have routinely classified as problematic. Accordingly, we are confident in the assessment that the challenged statements fall beyond the considerable boundaries the State is permitted when presenting its case and, therefore, constitute error.

The tougher call is the full extent of their impact. The State must show beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record—that there is no reasonable possibility that the error contributed to the verdict. *Sherman*, 305 Kan. at 109.

The evidence in this case fell short of overwhelming, but it was sufficient to sustain Ingram's conviction. The jury heard evidence that Jane's sisters were the first ones that she entrusted with information about Ingram's attack but that she swore them to secrecy. Several years later, Jane opened up to her father about the incident, but it was not until Jane's disclosure to her grandmother a month or so later that an investigation was spurred and authorities at the Child Advocacy Center (the CAC) had the opportunity to interview Jane about the incident. In each of her disclosures to adults, the conduct Jane revealed was the same—that Ingram penetrated her vagina with his fingers. It was during this meeting that Jane revealed that the inappropriate touching Ingram forced upon her included oral contact with her vagina in addition to the digital penetration. Jane also consistently recounted that when she screamed at the outset of the incident with the hope that her sisters might hear her, Ingram slapped her and ordered her to shut up, but that she ultimately succeeded in kicking him.

Jane's trial testimony was consistent with the version of events that she provided during the CAC interview. Additionally, each witness to whom she disclosed corroborated the timeline of her revelation. Jane's sisters testified and independently recalled that they were outside playing together one day while Jane was inside the trailer with Ingram, and when they each saw Jane later that day she was crying and refused to explain why. Jane eventually explained to them that her tears were the product of the rape by Ingram, but she requested their assurance that her secret would not be shared. Thus, while the State's evidentiary arsenal was somewhat limited overall by the nature of the offense and the passage of time, the testimonial evidence it was able to provide for the jury offered consistent accounts of the incident.

13

We also note that the evidence introduced to the jury was not limited to the incident involving Jane. The jurors also learned that when Ingram was 17 years old, he digitally penetrated a 12-year-old girl, and it resulted in a conviction for attempted aggravated indecent liberties with a child.

Ingram's counsel opted to attack the strength of the State's case with a credibility campaign orchestrated to undermine the State's witnesses and their respective versions of events. His counsel crafted a narrative that included fabricated claims of sexual abuse by the children with the hope that at least one of them would end up in their maternal grandmother's custody, thereby enabling the three sisters to spend more time together. They attempted to sow additional speculation amongst the jurors about the validity of Jane's account by highlighting how long it took her own biological father to trust that what she reported truly occurred.

Again, the constitutional harmless error inquiry under *Chapman* requires the State to prove beyond a reasonable doubt that the error did not affect the outcome of the trial. *State v. Gallegos*, 313 Kan. 262, 273, 485 P.3d 622 (2021). We are satisfied that burden was met here through a combination of the State's closing argument and the instructions issued by the district court.

The State certainly and, as we previously noted, erroneously explained to the jury that what this case did *not* entail was "typical" in prosecutions for child sex crimes—it did not offer DNA or fingerprint evidence and did not include any eyewitnesses. It ultimately directed the jurors to the heart of the case—the credibility contest that played out before them throughout the two-day trial and their responsibility to extract the truth. We find this evidenced by the State's closing argument wherein the prosecutor clarified that in the absence of physical evidence all that remained was for them to make a credibility determination and the attorneys were prohibited from directing them which door to choose. It was up to them to arrive at that conclusion on their own following a

14

review of the testimony they heard at trial. The prosecutor then methodically walked the jury through each count, and the testimonial evidence adduced then enabled it to find Jane's assertion that she was sexually violated by Ingram to be credible. The State then used the rebuttal portion of its closing to inform the jury of its ability to employ common sense during the course of their deliberations. It then returned to witness testimony to explain the integral role their common sense could play in arriving at a verdict.

The jury retired for deliberations with this information at the forefront of its mind. At that point it turned to the written variation of the instructions the judge and the parties had already advised them of on more than one occasion during the trial. Those instructions reinforced that statements and arguments of counsel are not evidence, that it is the jurors' responsibility to determine the weight and credit to assign the testimony of each witness and they may use their common sense as part of that equation, that they are to weigh everything admitted into evidence, and that the State alone carries the burden at trial and it must establish the elements for each individual charge beyond a reasonable doubt. Viewing those instructions in tandem with the evidence adduced at trial and the parties' synthesis of the two during closing arguments, we are convinced the jury had a clear understanding of the reality of this case and the appropriate lens through which to make that assessment. Accordingly, we are satisfied the State has sustained its burden to establish that its error in designating Ingram's case as a "typical" child sex offense from an evidentiary perspective did not impact the verdict or otherwise affect the outcome of the trial.

Before taking leave of this issue, we return briefly to the prosecutor's erroneous and pervasive statements regarding what is "typical" in the prosecution of child sex crimes. The Kansas Supreme Court has stated that "[a] prosecutor who knowingly and intentionally disregards the dictates of justice in Kansas courts does so at his or her peril." *Sherman*, 305 Kan. at 115. Additionally, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it

specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." KRPC 3.8, comment 1 (2026 Kan. S. Ct. R. at 399); *In re Spradling*, 315 Kan. 552, 621-22, 509 P.3d 483 (2022). The State must strike a balance between its duty to prosecute vigorously with its obligation to ensure the criminal justice system remains fair and impartial. That goal was not achieved here.

In the cases we outlined during our analysis of the "facts not in evidence" claim, the respective prosecutors in those cases directed the jury's attention to only a single factor that was outside the scope of the evidence elicited at trial. By contrast, and a distinction we find particularly troublesome, while the underlying root point was the same here—what is "typical" for prosecutions of child sex crimes—the prosecutor independently enlightened the jury as to *three* separate evidentiary facets of what is considered "typical": (1) an absence of physical evidence; (2) the lack of eyewitnesses; and (3) delayed disclosures by the victims. We cannot caution strongly enough the need for this conduct to be avoided in future cases. In *Chanthaseng*, the court cautioned that "[*t*]*he prosecutor in this case flew far too near to the sun. The next prosecutor to do so is highly likely to be burned*." (Emphasis added.) 293 Kan. at 150. The prosecutor for Ingram's trial came extraordinarily close to fulfilling that prophecy.

*Is Ingram's claim that the district court abused its discretion when it denied his request for a downward departure sentence properly before this court for review?*

Appellate courts review a district court's decision on whether there are substantial and compelling reasons to grant a departure for abuse of discretion. A district court abuses its discretion if: (1) its ruling is based on a legal error; (2) its ruling is based on a factual error; or (3) no reasonable person would take its position. *State v. Powell*, 308 Kan. 895, 902-03, 425 P.3d 309 (2018).

In Jessica's Law cases, the district court may grant a departure for a first time conviction if it "finds substantial and compelling reasons, following a review of mitigating circumstances." K.S.A. 21-6627(d)(1). The nonexclusive statutory mitigating circumstances include a defendant's lack of "significant" criminal history. K.S.A. 21-6627(d)(2)(A). The district court must review the mitigating circumstances without weighing them against aggravating circumstances. The district court must then decide if the mitigating circumstances provide substantial and compelling reasons to depart. If so, the district court must state the substantial and compelling reasons on the record. *State v. Jolly*, 301 Kan. 313, 324, 342 P.3d 935 (2015).

As part of his argument that the district court should have granted a departure, Ingram asserts that he had a meritorious defense partially because Jane's father equivocated on his response when Jane disclosed the sexual abuse to him. As the State highlights, Ingram did not raise this point for the district court's consideration. Rather, in his motion for dispositional or durational departure, Ingram confined his argument on his meritorious defense to the facts that the State's case lacked "strong evidence" and three trials were required to finally secure his conviction. At the sentencing hearing, Ingram did not mention the testimony offered by Jane's father. Therefore, the matter of her father's equivocation as a factor that supported a mitigated sentence was not properly preserved for our consideration.

Generally, issues not raised at the district court cannot be raised for the first time on appeal. *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022). "Supreme Court Rule 6.02(a)(5) (2022 Kan. S. Ct. R. at 35) requires an appellant to explain why he or she failed to raise an issue below and why it should be considered for the first time on appeal. We strictly enforce this rule." *State v. Holley*, 315 Kan. 512, 524, 509 P.3d 542 (2022). There are three exceptions to this rule: "'(1) [T]he newly asserted claim involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) . . . consideration is necessary to serve the ends of justice or to prevent the

17

denial of fundamental rights'"; and (3) the district court was right for the wrong reason. *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021). An appellate court's "'decision to review an unpreserved claim . . . is a prudential one.'" *State v. Rhoiney*, 314 Kan. 497, 500, 501 P.3d 368 (2021).

Ingram does not acknowledge that he neglected to include this claim in his departure motion or in his briefing to this court. Nor does he favor us with an explanation for why his new theory should be addressed for the first time on appeal. Therefore, we decline to delve into the merits of Ingram's sentencing issue.

Affirmed.